Argued June 22, modified August 1, 1916.

# PATTERSON *v.* CHAMBERS  POWER CO.

### (159 Pac. 568.)

**Vendor and Purchaser—Conveyances — Grant of Easement—Notice—Record.**

1.   Purchasers of land take title with constructive notice of the grant of an easement theretofore executed and recorded.

**Easements—Grant for Future Enjoyment.**

2.   There is no rule of law prohibiting the grant of an easement to take effect or to be enjoyed in the future.

**Waters and Watercourses—Conveyances—Grant of Easement—Validity of Grant of Future Easement.**

3.   The deed of land, "together with the water-power upon said premises with the right of way over Shaw's land claim to bring all the water that may be required to run the mills thereon, and other mills or machinery that may, at any time or times, be placed upon the above-described premises of whatever kind or nature; also the right to dig the present raceway as wide and deep as may be necessary, and to bank the dirt and stone on either side; also to include sufficient dirt and stone lying adjacent to the dams for the purpose of keeping them in repair"—conveys a sufficiently present and future easement or right sufficiently definite to be valid in view of the circumstances surrounding the grant.

**Waters and Watercourses—Conveyances—Grant of Easement—Duty of Grantee.**

4.   Nothing in such grant calls for action upon part of the grantee until the exigency contemplated in the deed shall arise.

**Contracts—Validity—Public Policy.**

5.   It is contrary to the general policy of the law to restrict the power of citizens to make any kind of contract which they may see fit to enter into, so long as the proposed contract does not affect the morals or well-being of society to such an extent as to be against public policy.

**Contracts—Validity—Indefiniteness—Surrounding Circumstances.**

6.   A contract will not be held void for indefiniteness when, by considering it as a whole and taking into consideration the surrounding circumstances, the true intent of the parties can be ascertained.

**Waters and Watercourses—Conveyances—Grant of Easement.**

7.   If from the terms of a grant of a raceway right of way there is manifested a clear intention that the grantee shall enlarge the space originally occupied by him in accord with the demands of the future, such enlargement will be upheld.

Waters and Watercourses—Conveyances—Grant of Easement.

8.   Under an indefinite grant of an easement or right of way for raceway, with nothing to indicate that it may be changed or enlarged in the future, the first location and user fixes the limit of the grant.

Easements—Conveyance—Rights of Servient Owner.

9.   The conveyance of an easement over land does not pass the title or interfere with the right of the owner of the soil to occupy it for any purpose not inconsistent with the easement.

    [As to servitude of easement to receive the flow of water, see note in 32 Am. Dec. 123.]

Waters and Watercourses—Conveyance—Future Easement—Adverse Possession.

10.   Adverse possession of grantor or his successors does not run against the right to enlarge a raceway as required by future necessities, at least until the right to enlarge has accrued, since until that time the grantee cannot object to use of land not needed by him, and is under no duty to warn the fee owners not to use such land because of his future and contingent rights.

Estoppel—Grounds—Disclaimer.

11.   In order to work an estoppel, a disclaimer must be so publicly made as to mislead another into believing that the person making it intended to abandon a right, and thereby induce that other to act to his injury in respect thereto.

Estoppel—Acquiescence—Easement.

12.   That predecessors of the owner of an easement for raceway, with right of future enlargement, had, in maintaining it, asked permission of adjoining owners to bank upon their property mud and silt that had accumulated in the ditch, and had desisted when objection was made, is not evidence of acquiescence by such predecessors in a claim by adjoining owners adverse to future necessary enlargement of the raceway, where in the conveyance of the original easement there was no right given to maintain the raceway by banking up such deposit on the side.

Waters and Watercourses — Easement — Grants — Construction — "Deepen."

13.   The grant of a raceway, with right to dig it as wide and deep as may be necessary to supply future defined needs, does not include or confer the right to maintain the ditch at its then depth by dumping upon adjoining property filth and silt which fortuitously accumulates on its bottom.

Easements—Waters and Watercourses—Nature of "Easement."

14.   A pure "easement" is one where the land of one person, which land is denominated the "servient tenement," is subjected to some use or burden for the benefit of the lands of another person, whose lands are termed the "dominant tenement"; but there are many water rights and rights of way for ditches which do not strictly come within this definition and yet are called "easements."

Waters and Watercourses—"Easements"—Raceway.

15.   Rights of way for pipe-line or raceway are, in a sense easements, although there is no dominant tenement.

Waters and Watercourses—Conveyance—Easements—Termination.

16.    Where an easement for raceway is conveyed as appurtenant to tract, a deed of part of the tract by the grantee passes such proportion of the easement, as the tract sold bears to the entire tract, unless the easement is reserved in the deed, and the easement is not extinguished.

Waters and Watercourses—Conveyance—Easements—Termination.

17.    Even if appurtenant to an entire tract, a water right in the nature of an easement may be reserved in a grant of any parcel of such tract, without extinguishing the easement.

Waters and Watercourses—Conveyance—Easements—Termination.

18.    The grantees of land subject to a recorded easement for raceway, with right of enlargement for future needs of a certain tract, cannot claim the easement is extinguished because the grantee of the raceway easement has sold part of the tract and reserved the waterpower or easement, as long as the water taken is necessarily used on that tract.

Waters and Watercourses—Grant of Easement—Raceway—Manner of Use.

19.    The owner of a raceway right of way for power purposes had no right to use the ditch for the purpose of floating logs, timber or cordwood, without protecting its sides from the consequent erosion.

Waters and Watercourses — Grant of Easement — Raceway — Manner of Use.

20.    Courts will not interfere with a change of use of a raceway for power purposes to use for floating logs and timber unless it imposes an additional burden upon the servient tenement.

From Lane: JAMES W. HAMILTON, Judge.

Department 1.    Statement by MR. JUSTICE McBRIDE.

This is a suit brought by Ida Patterson and 19 other residents of the City of Eugene against the Chambers Power Company and Frank L. Chambers, to enjoin them from widening the mill-race in the City of Eugene and thereby cutting away and destroying the plaintiff's property. The property involved constitutes an attractive residential portion of Eugene, and is of considerable value. It is situated along the banks of the mill-race, which is owned by the defendants and used to conduct water from the Willamette River through the City of Eugene to certain mills situated on 23 acres of land known as the "mill property." The de-

fendants claim and assert the right to widen the mill-race indefinitely as their needs may require, but for their present purposes are proposing to take from plaintiffs only a 20-foot strip of land on either side of the mill-race, which can be done without actually tearing down or destroying any of plaintiff's buildings, but which, nevertheless, will seriously impair the beauty and value of the property. The mill-race was constructed in about 1852. Since that date, and for more than 48 years, the plaintiffs' property, or at least the greater portion of it, has been used for residence purposes. The plaintiffs and their predecessors in interest have improved their said lands to the very edge of the water flowing through the race thereon, making lawns and gardens and planting and growing shade trees, and otherwise improving the land bordering on the ditch, all with the knowledge of defendants and their predecessors in interest, and without any active claim or assertion on the part of the defendants that they had the right to widen said mill-race and cut away the banks thereof. The defendants base their claim to widen the ditch upon certain mesne conveyances from Hilyard Shaw, the original owner of the ditch and of all the land in controversy. The facts may be briefly stated as follows: In 1852 Shaw, being the owner of the land through which the ditch passes, constructed the ditch in controversy for the purpose of supplying water-power to certain mills situated near the northwest corner of the land owned by him. On March 1, 1856, he conveyed to defendants' predecessors in interest 23 acres of land, described generally as beginning at the northwest corner of his donation land claim, thence east along the northern boundary 11 chains, thence south 21 chains, thence west 11 chains to the western boundary, thence north along

said boundary 21 chains to the place of beginning. There was situated upon this tract at the time of the conveyance a sawmill and gristmill owned by Shaw and operated by water-power obtained from the ditch in . question here. Shaw's deeds contained clauses which read:

"Together with the water-power upon said premises with the right of way over Shaw's land claim to bring all the water that may be required to run the mills thereon, and all other mills or machinery that may at any time or times be placed upon the above-described premises of whatever kind or nature; also the right to dig the present raceway as wide and deep as may be necessary, and to bank the dirt and stone on either side; also to include sufficient dirt and stone lying adjacent to the dams for the purpose of keeping them in repair."

The greater part of these 23 acres of land and the water right above conveyed are now owned by defendants, who lease water-power conveyed by the ditch to the premises to be used in operating machinery in various factories and mills erected thereon. The defendants from time to time have floated cordwood and other timber along the ditch, and claim the right to do so. The ditch at its present capacity being insufficient to convey the volume of water necessary for the factories now on the 23 acres above described and for other contemplated industries, the defendants proposed and claimed the right to widen the ditch about 20 feet on each side in order to secure the necessary power. Upon the trial there were findings and decree enjoining defendants from widening the ditch, cutting shrubbery or trees along the banks, or floating cordwood or timber upon it, and substantially prohibiting them from in any way extending it laterally, confining

it simply to the right to maintain it at its present
capacity.   From this decree, defendants appeal.

MODIFIED.

For appellants there was a brief with oral argu··
ments by *Messrs. Thompson & Hardy.*

For respondents there was a brief over the names
of *Mr. John M. Pipes, Mr. Edwin O. Potter* and *Mr.
Lark Bilyeu,* with oral arguments by *Mr. Pipes* and
*Mr. Potter.*

MR. JUSTICE McBRIDE delivered the opinion of the
court.

1–6. The whole case here turns upon the construc-
tion of the deed from Shaw.   It is plain and direct in
its terms, and was executed and recorded before any
of the plaintiffs purchased their property, and they
therefore took title with constructive notice of any
burden which it created upon their holdings.  ˙We are
aware of no rule of law, and there is none, prohibiting
the grant of an easement to take effect or to be en-
joyed in the future, and that is this case.   We have
first a grant of the water-power upon the premises
conveyed which necessarily made the raceway which
carried the water across the grantor's premises to the
23-acre tract a present easement in the land conveyed.
Then we have the right to dig the raceway as deep
and wide as may be necessary to run the mills now
on the tract sold, and all other mills or machinery that
may, at any time, be placed thereon, which creates a
right or easement in the land of the grantor to be
taken advantage of and enjoyed whenever the neces-
sity of the case requires.   In this there is nothing in-
definite, nothing that calls for action upon the part of

the grantee until the exigency contemplated in the deed shall arise. It is contrary to the general policy of the law to restrict the power of citizens to make any kind of contract which they may see fit to enter into so long as the proposed contract does not affect the morals or well-being of society to such an extent as to be against public policy; and it is also a well-recognized principle of legal construction that a contract will not be held void for indefiniteness when by considering it as a whole and taking into consideration the surrounding circumstances the true intent of the parties can be ascertained: Chitty, Contracts (17 ed.), 97, 98.

7–13. Let us now consider the circumstances under which the grant under consideration was made. The conveyance was executed on March 1, 1856, at a time when the now flourishing City of Eugene was a very small country village, which did not arise to the dignity of a corporation until seven years later. The land over which the raceway extended had not been platted, and was all owned by the grantor, who had a sawmill and gristmill upon the 23-acre tract now owned by defendants. Presumably there was water enough, and more than enough, to operate the machinery then employed, and it is evident from all the circumstances, as well as from the terms of the deed, that the parties had in mind at the time the construction of additional factories and mills upon the tract conveyed, and also contemplated the necessity for additional water-power to operate them when they should be so constructed. Hence it was natural that the purchaser should require from the grantor such a conveyance as would effectuate this intention. Plainly it was vital to the grantee in view of the contemplated development of the tract as a factory site that these facilities should be secured, and it was clearly to the advantage of the grantor,

that until the occasion for widening the ditch arose, he should have the use of all the land lying adjacent to it which the present necessities of the grantee did not require.   There was no method by which the exact future requirements of the grantee could be estimated or even approximated.   As population increased and commerce extended the natural result would probably be to increase the demand for factory and mill sites, which would result in an increased demand for water-power.   The demand for manufactured products was then local, for the reason that navigation of the river was only seasonal and difficult, and a transcontinental railroad was a dream and a hope only realized many years after.   In this condition of uncertainty as to the developments of the future the parties made the contract in question.   The grantee wished to secure all that might be necessary for the possible future development of his power site.   The grantor did not wish to grant more than such development might require, and not until it might be so required.   Therefore they provided in the deed that the lateral extent of the easement should be measured by the growth of manufacturing industries upon the tract.   That this was indefinite as to the extent laterally is in a sense true, but it is no more true than it is in contingent contracts and grants which are made every day and universally recognized by the courts.   The principles here enunciated are not new, and have been applied in this state in a case where the grant of an easement was much less specific than in the case at bar.   In *Salem Capital Flour Mills Co.* v. *Stayton Water-Ditch Co.* (C. C.), 33 Fed. 146, 148, decided by Judge DEADY, the grant was:

"The right of a canal-way through all and any lands then owned or occupied by [the grantors] in Marion

County necessary to be passed through in conveying the water of the Santiam into the channel of Mill Creek,'' and also the right ''to enter upon the same for the purpose of cutting a canal sufficiently large to admit the flow of any amount of water required by said company for their purposes at Salem.''

'A ditch was constructed in 1857, but in 1873 the Santiam River was so deflected from its course as to leave the intake of the ditch quite a distance from the new channel of the river, and the plaintiff prolonged its ditch for a considerable distance up the river to a point where it was practical to establish a new intake. The grantees of the original owner of the land interfered with the operation of this extension of the ditch, contending, as here, that the easement became fixed when the original ditch was dug. Upon this point Judge DEADY observes:

''The power and privilege was not exhausted by the construction of the ditch to a certain point on the river in 1857. For the purpose of maintaining a canal or ditch on, over, and through the Porter donation, so as to receive and take water from the Santiam thereon, in such quantity as the company or its successors in interest might or may need or require at Salem, it continued and still continues in full force. * * At the date of the grant of the easement Porter and wife were seised of an estate of inheritance in the land, and there is nothing in the terms of their deed or the nature of purpose of the easement which at all indicates an intention to grant the easement for a less time than the duration of their own estate in the premises, but the contrary. Hence the right to maintain a ditch on and through the Porter donation was to conduct water from the Santiam to the channel of Mill Creek, for the purposes of the woolen company at Salem, is perpetual; and if, in the course of time or events, it becomes necessary, to accomplish such purposes, to widen, deepen, or lengthen said ditch, the then owner of the easement may do so.''

In *Everett Water Co.* v. *Powers,* 37 Wash. 143 (79 Pac. 617), there was a conveyance to defendants' grantor of a right of way for a water-pipe line over the grantor's land, and the right to divert the flow of water with a habendum to the grantee and his heirs and assigns forever. There was no time limit for the execution of the purposes of the grant. It was contended that the deed was void for uncertainty for that reason, and the court thus disposes of this contention:

"It is claimed that the instrument is void for uncertainty, in that no time certain is fixed for the execution of the purpose of the grant. It was, however, competent for Woods to make such a conveyance without any time limitations. He could convey an interest in the realty as absolutely as he could convey the whole of it. The right of way and the right to divert the water were a part of the realty itself. By the terms of the deed these were conveyed to the grantee, his heirs and assigns forever, subject to certain specified reservations pertaining to the domestic use of the water by the grantor. The absence of specific time limitations must be construed to mean that no such were intended."

It was also claimed that the right of way was abandoned by nonuser. Concerning this the court says:

"Appellants contend that the right of way was abandoned. Soon after the deed was made, and in the same year, the grantee selected a strip for right of way, and began the construction of a pipe-line system. An outstanding lease, older than the right of way and water right, was held by one Crook. The deed was therefore subject to the lease, and the lease continued until 1896. An application by the lessee to enjoin the continuance of construction work, and the diversion of the water, was sustained by this court: *Crook* v. *Hewitt,* 4 Wash. 749 (31 Pac. 28). Nothing further could be done until after the lease expired in 1896. Meantime there was not an abandonment. The evi-

dence shows that there was no such intention. Some of the constructed work was left in place, and material remained upon the ground. Occasional examination was made of a constructed dam, and debris was removed to prevent injury thereto. But it is insisted, further, that the failure to proceed promptly after the lease expired, together with the delay until 1902, amounted to abandonment. This court held, in *McCue* v. *Water Co., supra,* that where no time is fixed for the occupation and use of a granted right of way, no mere nonuser, for any length of time short of the period of the statute of limitations, will defeat the right of grantee to occupy and use it for the purposes of the grant. If the statute of limitations comprehends the running of time against a mere nonuser, under a grant of this kind, it in any event did not begin to run until such time as the grantee might have peaceably occupied, which was after the lease expired in 1896. Active user was again attempted about August 1, 1902, and this suit was brought within the same month. A period of six years only having expired, it follows that the limitation period fixed by our statutes for actions pertaining to the possession of lands had not expired.''

What is said in the foregoing excerpt in regard to the statute of limitations can manifestly have no application to the case at bar, since no necessity for widening the ditch, and consequently no right to exercise the right to do so, arose until a short time before the commencement of this suit. By the terms of the deed defendants were authorized to widen the ditch so as to furnish water to propel such machinery as might be placed upon the tract conveyed in the future; and to widen it at once and before there was any probability that an increased flow of water would be required would have been going beyond the terms of the grant. While the defendants would probably not be required to enlarge their ditch piecemeal, there

certainly must be some present probability that, either
at the time of the enlargement or within a reasonable
time in the future, the increase of manufacturing es-
tablishments on the tract conveyed would fairly justify
such enlargement.

The case of *Collins* v. *Driscoll,* 34 Conn. 43, is an
instructive case. In that case land was conveyed
which had on it a drainage ditch leading from it over
the grantor's land; the ditch then being six feet deep,
six feet wide at the top, and two feet wide at the bot-
tom, the sides sloping so as to prevent the banks from
caving in. The conveyance was of the land ''with the
privilege of deepening the ditch leading from the
premises, to drain the same over the grantor's land
as deep as the grantees may desire.'' To deepen it
required either curbing or widening it at the top, which
latter was the usual mode of ditching swamp-lands.
The grantees later desired to deepen the ditch, and in
order to do this without curbing, they widened it at
the top, cutting away such portions of plaintiff's ad-
joining soil as were necessary for that purpose, and
thereupon plaintiff brought an action of trespass.
Plaintiff's counsel argued among other matters:

''The words giving 'the privilege of deepening the
ditch' to an unlimited depth cannot be strained to
confer the right to widen to a proportionate or un-
limited width. The construction of words should be
according to the literal sense: 1 Swift, Dig., 223, 229.
It is only where the language is equivocal or doubtful
that the situation of the parties or the surrounding
circumstances may be shown: *Strong* v. *Benedict,* 5
Conn. 210; *Brown* v. *Slater,* 16 Conn. 195 (41 Am.
Dec. 136). The circumstances confirm the literal con-
struction. Simply deepening the ditch would not in-
jure the plaintiff's meadow; widening would. Again,
no man would convey an unlimited right to deepen
and widen also, for this would be more than equivalent

to conveying all his land. The language conferring the privilege of deepening the ditch is equivalent to an express provision that it shall not be otherwise disturbed.''

But the court held that when the grantor gave the privilege of deepening the ditch, the parties must have had in mind the method that the grantor had used in its original construction, i. e., by sloping the sides so as to prevent caving, instead of the unusual method of curbing, and that, therefore, the grantees took by implication the right to enter upon and cut away plaintiff's land for that purpose. This case is in many particulars similar to the case at bar, except in so far as the court goes beyond the necessities of the case at bar in holding the right to cut away plaintiff's land was conferred by implication, while here such right is expressly conferred. There, as here, the extent of such lateral easement was not directly expressed; there, as in the case at bar, the actual extent of the right was limited only by the future necessities of the grantee, and there, as here, there was no limitation as to the time within which the right should be exercised. Other cases more or less remotely bearing upon this phase of the case are: *Adams* v. *Warner,* 23 Vt. 395; *Stevenson* v. *Wiggin,* 56 N. H. 308; *Jordan* v. *Mayo,* 41 Me. 552; *Herman* v. *Roberts,* 119 N. Y. 37 (23 N. E. 442, 16 Am. St. Rep. 800, 7 L. R. A. 226); *Quigley* v. *Baker,* 169 Mass. 303 (47 N. E. 1007); and see generally notes to *Winslow* v. *Vallejo,* 5 L. R. A. (N. S.) 851; *Spear* v. *Cook,* 8 Or. 380; *Wheeler* v. *Wilder,* 61 N. H. 2; *Standard Oil Co.* v. *Buchi,* 72 N. J. Eq. 492 (66 Atl. 427). The effect of all these cases is that if from the terms of the grant there is manifested a clear intention that the grantee shall enlarge the space origi-

nally occupied by him in accordance with the demands
of the future, such enlargement will be upheld.

The able and ingenious counsel for plaintiffs have
suggested no good reason why upon principle such an
easement may not be created, and the authorities cited
by them fail to support their contention. In the first
case cited (*Barrett* v. *Hosmer,* 1 Root (Conn.), 271)
there was a grant to the defendant of the privilege of
erecting a gristmill and dam. The grantee built the
mill and dam about the year 1687, and the dam was
maintained at a certain height until about 1790, when
the then owners raised it 10 inches, thereby overflow-
ing plaintiff's meadow. It was held that the easement
became fixed and definite when the dam was built and
long maintained at the original height. It will be
noticed here that there was nothing in the grant pro-
viding for a future enlargement of the easement, as
there was in the deed through which defendants claim,
and it has always been the law that where there is an
indefinite grant of an easement of this character, with
nothing to indicate that it may be changed or enlarged
in the future, the first location and user fixes the limits
of the grant. The next case (*Chapman* v. *Newmarket,*
74 N. H. 424 (68 Atl. 868, 15 L. R. A. (N. S.) 292),
was a case where there was a grant of a right of way
to flow water across the grantor's lands, the quantity
of water not being specified. It was held that such a
grant conveyed an unlimited reasonable right to flow
water, but that the grantee could not flow water where
there was no necessity for it. The gist of the holding
in that case was that the defendant could not flow
water for which he had no use when such flow injured
an adjoining proprietor. The right to flow water in
a reasonable manner to the extent of the grantee's
necessities was conceded. The next case cited, and

the only one which comes anywhere near supporting plaintiff's contention, is *Wood* v. *Saunders,* L. R. 10 Ch. 582. The case is poorly reported and the opinion ambiguous. Saunders and Bruce leased a mansion and the grounds about it to Wood for the term of two years, with the option to purchase at the end of that period. The lessee was to have the privilege of the free passage of water and soil to the existing cess-pools on other lands of the grantor in and through all sewers then constructed, or to be constructed, through such lands for the term of two years. The mansion on the premises, called the "Priory House," could not be enlarged during the period of the lease without the consent of the lessor, and in its then condition it could accommodate about 25 persons. Before the expiration of his lease Wood exercised his option, and purchased the premises, taking a deed which gave him "the free running of water and soil in and to the existing cesspools and in and through all the drains, sewers and watercourses, constructed or thereafter to be constructed, through the adjoining property of L. B. Knight Bruce."

The only cesspool then existing on the adjoining property of Bruce was an open ditch or moat about 150 yards from the Priory House, and the only drains or sewers were those conveying the water and sewage from the Priory House to the moat, and only a part of this drainage was carried there. When Wood got his title, he enlarged the Priory House from a building suitable for 25 inmates to one that would accommodate 150 persons, and converted it into a lunatic asylum, in consequence of which the volume of sewage was greatly increased, creating an intolerable nuisance. Saunders being in possession of the Bruce lands stopped up the drains, and Wood brought suit to en-

join him.  It was held that the deed should be con-
strued as giving no greater easement than that exist-
ing under the lease, and that the right of drainage
should be referred to the conditions existing at that
date when the Priory House accommodated only 25 per-
sons.  The conclusion of the vice-chancellor seems to
have been that the grantee was free to construct as
many new drains as he wished, but that the aggregate
flowage through them could not be increased beyond
what it was at the time the deed was made.

In the case at bar the deed expressly permits a
future increase in the flow of water, and expressly
provides that the ditch may be widened to accom-
modate it.  There is no room here for speculation as
to what Hilyard Shaw intended to grant by his deeds.
If it is in the power of a man by deed to grant an
easement which may be enlarged according to the
future requirements of the grantee, and to make such
future requirements the measure of the extent of his
right, then the grantor has used apt words to accom-
plish that very thing.  It is a question of his power
to so contract, not of construction as to the meaning
of the conveyance.  We have given more than usual
consideration to the last case cited, for the reason
that at first glance it apparently sustains the conten-
tion of plaintiffs, although a critical analysis of it
shows that the conditions in that case were so differ-
ent from the one at bar that it can have no application.

Other cases are cited by counsel, but, when ex-
amined, they all turn either upon a construction of the
terms of the grant, or upon that well-known principle
that where an indefinite easement is granted, such as
a right of way across the grantor's land, without
specifying the particular location, or the right to flow
water through a ditch without specifying the quantity,

the act of the grantee in using a particular portion
of the land as a way in the first instance, or the act
of the grantee in the second instance in habitually
and for a long period flowing a certain quantity of
water, is a practical construction of the intent and
extent of the grant; but in none of the grants involved
in the cases cited does there appear a provision for
a future enlargement of the right of the grantee such
as appears in the case at bar.

The possession by the plaintiffs of the parcels of
land adjoining the ditch has not been adverse to de-
fendants. The conveyance of an easement over land
does not pass the title or interfere with the right of
the owner of the soil to occupy it for any purpose not
inconsistent with the easement: Washburn, Ease-
ments (3 ed.), 3, 9; Goddard, Easements, 4. It fol-
lows, therefore, that the plaintiffs, who are successors
of Shaw, had a perfect right to occupy and improve
their land adjoining the ditch, so long as such occupa-
tion or improvement did not interfere with the opera-
tions of defendants. Defendants were never in a posi-
tion to bring ejectment or trespass against them until
they were in a position to show that the use of the
adjoining land was necessary, and that the growth
of manufacturing business upon the 23-acre tract had
made it essential for them to widen the ditch in order
to procure additional power. If the plaintiffs, with
the conveyance of Shaw to defendants' predecessors
staring them in the face, saw fit to make valuable im-
provements upon the adjoining lands under the mis-
taken idea that the necessity for defendants' occupying
it would never arise, or that the rights given by Shaw's
conveyances would not or could not be successfully as-
serted, they will have to take the consequences of that
mistake. They had a legal right to take that risk,

and an absolute legal right to improve the banks of
the ditch subject to the encumbrance created by Shaw's
conveyance to defendants' predecessors.

The case of *Arthur Irr. Co.* v. *Strayer,* 50 Colo. 371
(115 Pac. 724), is cited and quoted from at length as
holding a view contrary to that above expressed, but
a close examination of it shows that the plaintiff in
error in that case had simply an oral permission to
construct a ditch across certain lands, without any
stipulation as to its width; that in 1873 they con-
structed a ditch 10 feet wide on the bottom, and main-
tained it at that width until 1906, when they proposed
to widen it to the extent of 40 feet, 20 feet on each
side. Strayer and other grantees of the original
owners of the land adjoining, which subsequent to the
construction of the ditch had been laid out in lots
and blocks, brought a suit to enjoin the proposed
widening of the ditch. It was held that:

"Where one buys lands, through which, at the time,
there exists an irrigating ditch in operation, the right
of the owner of such ditch to maintain and use the
same as before is in no wise affected. The right so
acquired is an easement in the lands through which
the ditch runs, but the legal title of the lands upon
which the servitude rests is in the owner of the ser-
vient estate. While the right so acquired extends to
the bed of the ditch and sufficient ground on either side
thereof to properly operate the same, it does not vest
authority in the owner of the ditch to place a greater
servitude or burden upon the lands than existed at
the time the ditch was constructed, or was reasonably
necessary to properly operate it. The extent of the
right necessarily depends, in each case, upon various
circumstances and conditions."

The court says further:

"The defendant held no right of way by deed. Its
right was an easement depending solely upon con-

tinued use. It not only failed to use the particular
land in question, but acquiesced in its use and im-
provement by the very ones in whom the fee was
vested.''

The case is not different from a hundred others
that might be cited, holding that where the right of
way is granted in general terms, it becomes fixed by
location and user. In the case cited there was no
grant and no provision for future widening of the
ditch; here there are both. Neither is there anything
shown here that ought to work an estoppel. The de-
fendants were under no legal obligation to warn the
owners of the fee not to do that which they had a
perfect legal right to do. Had defendants been the
owners in fee of the lands adjoining the ditch with
the present right of possession, and under such cir-
cumstances permitted the plaintiffs to make improve-
ments upon the property under a mistaken idea as
to their title, perhaps it would have been their legal,
and certainly their moral, duty to have spoken, but
they were not the owners of the fee, and had no present
right of possession, except, perhaps, to pass along the
ditch for the purpose of improving or protecting it,
and it was no more their duty to warn the owners of
the fee against making improvements upon their
potential right of way than it is the duty of a pur-
chaser of a mortgage to warn the mortgagor against
making improvements upon the encumbered property
that may be sold to satisfy the exigency of the mort-
gage. The grant made by Shaw created an encum-
brance on the property adjoining the original ditch,
and the recording of the deed was notice of that en-
cumbrance, and parties making improvements along
the route of the ditch and near enough to be affected
by any probable widening of it that the grantees might

make, made them at their peril.   There is no evidence
of acquiescence in the improvements by defendants
further than that they did not actually object to them,
and that they did not declare orally the claim which
their deeds were asserting all the time.

It is claimed that Walter Edris, a former owner of
an interest in the ditch, disclaimed the right to widen
the ditch, and that this disclaimer is binding upon the
defendants.   His testimony, however, does not in-
dicate any disclaimer, but a mere failure to assert a
right which his statements show it was unnecessary
to assert, as he testifies that the ditch then furnished
all the water that was necessary.   A disclaimer, to be
of value, must have been so publicly made as to have
misled another person into the belief that the person
making it intended to abandon an existing right, and
thereby induced him to act to his own injury in respect
to the subject matter.   Such a state of facts does not
appear in the testimony here.   Neither is the fact
that Edris and other grantees asked permission of ad-
joining owners to bank upon their property the mud
and silt that had accumulated in the bottom of the
ditch, and had desisted when objection was made, any
evidence of acquiescence by them in an adverse claim
by adjoining owners as against the easement now
claimed by defendants.   To "deepen and widen the
ditch" means to make it deeper and wider than it
then was, and does not, either by its terms or by rea-
sonable implication, mean that in order to maintain
it at its then depth defendants were at liberty to dump
upon adjoining property filth and silt which had for-
tuitously accumulated on the bottom, thereby render-
ing it shallower.   They had no such right.

14–18. It is claimed that the easement granted is
appurtenant to the 23 acres of land conveyed, and that

a conveyance of a portion of the land reserving the water-power extinguishes the easement so far as these defendants are concerned; the argument being that these defendants are not themselves engaged in operating machinery on the tract, but are selling power to other persons who are operating such machinery and who are not demanding any increased power. The authorities cited do not sustain this position. A pure easement is one where the land of one person, which land is denominated the "servient tenement," is subjected to some use or burden for the benefit of the lands of another person, whose lands are termed the "dominant tenement"; but there are many water rights and rights of way for ditches which do not strictly come within this definition and yet are called easements. For instance, one may purchase the right of way for a pipe-line to convey water for the purpose of selling it to such of the inhabitants of a particular town as may choose to buy, and yet, strictly speaking, there is no dominant tenement and the way is appurtenant to nothing. The same is true of a ditch constructed for the conveyance and sale of water to persons along the line who may desire to purchase, or for general sale to persons who desire it for power purposes. Rights of way for these purposes are in a sense easements, but there is no dominant tenement.

The deed in question conveys: (1) A specific parcel of land; (2) a right to the grantee to the ditch and water flowing therein for the purpose of operating the machinery then upon the land and such other machinery as should be placed there; (3) the right to enter upon the grantor's land and appropriate so much of it as may be necessary to operate any machinery placed upon the granted premises in the future. In the very nature of things the water right

was the principal thing conveyed. The 23-acre tract described in the deed would be worthless if there were not water to operate the machinery, and the future development of the tract as a factory district would be impossible without the right to convey across the land of the grantor such additional water as would make such factories practicable. Conceding for the purposes of the argument that the terms of the deed made the water appurtenant to the tract conveyed, it does not follow that a segregation of the tract by sale of part of it destroyed the water right. Unless reserved in the conveyance, it would pass by the deed in such a proportion as the acreage of the tract sold bore to the whole 23 acres: *Ruhnke* v. *Aubert,* 58 Or. 6 (113 Pac. 38).

But even if an appurtenance to the 23 acres, the water right may be reserved in a grant to any parcel of the land: *Sweetland* v. *Olsen,* 11 Mont. 27 (27 Pac. 339). Defendants' relation to the water right and way in question is fixed by the deed, which, in effect, grants to them all the power then produced through the agency of the ditch, and as much more in the future as can be used in factories erected on the 23-acre tract. They would have no right to cover the tract with factories to its full capacity, and then build other factories upon adjoining land and increase the capacity of the ditch in order to supply these additional mills, because this would be putting a burden upon the servient estate beyond that which was contemplated in the grant; but so long as they confine their operations to factories situated upon the 23 acres, it is a matter of no moment to these plaintiffs, who take subject to Shaw's conveyance to defendants' grantors, how the water is apportioned among occupants of the dominant tract. Neither is it of im-

portance as to who owns the tract. The defendants own power as well as land, and it is inconceivable that it was the intention of the grantees of Shaw to cover the 23 acres with their own mills. The tract was principally valuable as a place where factories could be built and the water-power thereby find a market. The transmission or leasing of water-power to factories and mills is a common thing in the manufacturing portions of this country, and the prospective chance of doing so with profit in this instance was probably one of the incentives for the original purchase of this tract and water right from Shaw.

There are, no doubt, cases where the right or easement is so intimately connected with the land that a reservation of it destroys it entirely. Such a case is *Cadwalader* v. *Bailey,* 17 R. I. 495 (23 Atl. 20, 14 L. R. A. 300). Cadwalader purchased from Bailey and another certain lands situated adjacent to Bailey Beach, a bathing resort. In the deed was a covenant by the grantors that they would not construct any buildings upon certain parts of said beach between the lands granted to plaintiff and the water; the evident object of this covenant, as the court found, being to preserve the view of the grantee from obstruction. Cadwalader sold the granted premises to another, but in the deed reserved to himself all the rights arising from the covenant of his grantors not to build in front of the land. His grantors did build, and he brought a bill in equity to compel them to remove the building. The court held that as the purpose of the covenant was to prevent an obstruction of Cadwalader's view from the premises sold to him, and as he had sold the premises, and therefore had no view to obstruct, he had no cause of suit, and his reservation destroyed the easement created by the covenant. But here defendants

have a profit in the lands they have conveyed or leased by furnishing water-power for the factories thereon. As they or their predecessors could have bought the water right without buying the land in the first instance, so they can sell the land without selling the water-power now, or they can sell the water right and retain the land; the only restriction being that whatever water-power is used must be used in factories erected on this tract, and that no more may be taken than is necessary for these purposes.

19, 20. The defendants have no right to use the ditch for the purpose of floating logs, timber or cordwood, without protecting its sides from the erosion that is necessarily caused by such use of it. Courts will not interfere with a change of use of an easement of this character unless it imposes an additional burden in some way upon the servient tenement, but it is clear that unless the banks of the ditch are protected, either by booming, riprapping with stone or bulkheading with timber, such use will add to the burden, and it should be prohibited until this is done.

The defendants will be permitted to widen their ditch so as to bring it up to 50 feet in width, and will be enjoined from further widening it, and from throwing mud and silt from the bottom upon adjacent property. Neither party will recover costs here or in the court below.                                    MODIFIED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BURNETT and MR. JUSTICE BENSON concur.