**Ronald R. LETHIN and Beverly M. Lethin, husband and wife, and Clarke R. Lethin, David D. Lethin, Douglas T. Lethin and Molly L. Lethin, children, as tenants in common, doing business as Ronald R. Lethin and Company, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**No. Civil Action 83–188–PA.**

United States District Court, D. Oregon.

March 28, 1984.

David A. Rhoten, Rhoten, Rhoten & Speerstra, Salem, Or., W. Louis Larson, Larson & Fischer, Astoria, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., William B. Borgeson, Asst. U.S. Atty., Portland, Or., for defendant.

## OPINION AND ORDER

PANNER, District Judge.

Plaintiffs brought this action against the United States to quiet title to real property located along the south bank of the Columbia River in Hammond, Oregon. Title 28 U.S.C. § 1346(f) confers jurisdiction. Trial was to the court. I hold that plaintiffs have title in fee simple to the disputed property, but that defendant maintains an easement across the land for the general purpose of gaining access to the river.

## I. BACKGROUND.

On February 29, 1887, Bartholomew and Rachel Kindred conveyed to the United States a parcel of land to be used to establish a Life Saving Station. This grant included upland property and tideland area between the high and low water marks on the south bank of the Columbia River, together with a right of egress and ingress in

any direction over the grantors' land "for the purpose of carrying out the intentions of Congress in establishment of Life Saving Stations." The Life Saving Service subsequently built the Point Adams Life Saving Station on the property conveyed by the Kindreds.

In approximately 1905, the United States exercised its right of way by constructing a wooden walkway to the Columbia River from its property in a northerly direction over property owned by Hammond Lumber Company. Hammond Lumber acquired its property in 1904 from one of the Kindreds' successors in interest. Hammond Lumber is plaintiffs' predecessor in interest.

In 1907, the United States and Hammond Lumber agreed that the United States would relocate its right of way by moving its walkway to a position leading in a northeasterly direction at right angles to the Columbia River. The relocation of the right of way was to permit Hammond Lumber to construct a railroad on the adjoining property. In return, Hammond Lumber agreed to construct a new boathouse on the river for the Life Saving Service. Although correspondence between the United States and Hammond Lumber indicates that there was some discussion of a "conveyance" of the property, no such conveyance was ever executed. The agreement between the parties related only to the right of way, and not to title.

The United States Coast Guard eventually acquired use of the Point Adams Station as successor to the Life Saving Service.

In 1930 or earlier, a concrete sea wall was constructed on Coast Guard property at or above the then high water mark. In approximately 1944, the tideland area north of the Coast Guard property was filled with spoils from dredging of the Columbia River. This fill substantially altered the high and low water marks. The present high water mark is located approximately where the former low water mark was located. Between 1944 and 1946, the Coast Guard constructed the present walkway to the boathouse in a position slightly eastward of the prior construction.

In 1967, the Coast Guard decommissioned the Point Adams Station and transferred its boats and personnel to Cape Disappointment Station in Illwaco, Washington. The fact that the Coast Guard had discontinued its Life Saving Service at Point Adams was well-known in Hammond. In 1971, the Board of Survey of the Coast Guard recommended that the right of way, walkway, and boathouse be declared "excess to the needs of the Coast Guard." From 1968 to approximately 1977, the Coast Guard used one of the station buildings for telecommunications activity.

The National Marine Fisheries Service (NMFS), a federal agency, began using the Point Adams Station in approximately 1969. In 1972, ownership was transferred to that agency. NMFS continues to use the facility, maintaining a research laboratory. NMFS now uses the walkway to gain access to its research boats and to bring samples in from the river.

## II. DISCUSSION.

The only property still at issue in this action is a triangular parcel between the east edge of the Coast Guard walkway and the west boundary of plaintiffs' property. A diagram (not to scale) showing the general area is appended to this opinion.

With respect to the disputed parcel, plaintiffs contend that the interest conveyed to defendant by the 1887 Kindred-United States deed was an easement for life saving purposes. Plaintiffs assert this easement was extinguished when the Coast Guard ceased to use the Point Adams Station for those purposes. Defendant, however, asserts that it is owner in fee simple of the disputed tract. This position is based on the theory that the dividing line between plaintiffs' and defendant's land is not as recited in the 1887 deed, but runs at right angles to the pierhead of the Columbia River, intersecting the boundary lines of the upland tracts at the high water mark as established in 1944. In the alternative, defendant argues that it acquired a prescriptive easement for the walkway, and

ownership to the land by adverse possession.

This dispute arises from uncertainties created by the language of the 1887 Kindred-United States deed. It is complicated by the inevitable lack of certainty surrounding conveyances of riparian property, and the absence of clearcut rules for resolving disputes over boundaries to such properties.

### A. *Defendant's Claim Of Fee Simple Ownership.*

■ Boundaries of riparian land are frequently designated with reference to the adjacent body of water. Because beds and shores of bodies of water tend to change location, the rule has developed that, where such changes are by accretion, the boundary will follow the water rather than remain where it was at the time of the original conveyance. *State Land Board v. Corvallis Sand & Gravel,* 283 Or. 147, 161, 582 P.2d 1352 (1978). Accretion is "a process of gradual and imperceptible additions of alluvial materials to lands bordering on a body of water." *Avulsion and Accretion—Emphasis Oregon,* 3 Willamette L.J. 345 (1965).

Several policy considerations underlie the rule regarding accretions. Oregon courts have particularly emphasized two considerations: protection of the upland owner's right of access to water, and the reliable ascertainment of boundaries. *See, e.g., Corvallis Sand & Gravel,* 283 Or. at 162, 582 P.2d at 1361; *Purvine v. Hathaway,* 238 Or. 60, 63–64, 393 P.2d 181, 183 (1964). With respect to the second consideration, the Oregon Supreme Court has explained:

If the location of the stream at the time of conveyance were regarded as the boundary in spite of the stream's imperceptible movement, as time passed the proof of the original location of the boundary line would, in most cases, be practically impossible. Such uncertainties in the identity of the original boundary line (ordinarily the unmarked thread of the stream) would be a fertile source of litigation. It is better, therefore, that the boundary be regarded as moving with the gradual movement of the river. *Corvallis Sand & Gravel,* 283 Or. at 162, 582 P.2d at 1361, quoting *Purvine v. Hathaway,* 238 Or. at 63–64, 393 P.2d at 183.

■ There is an exception to the general rule, however, for changes caused by avulsion. Avulsion is a sudden change in the course or bed of a stream. *Avulsion and Accretion—Emphasis Oregon,* 3 Willamette L.J. at 347. When a boundary stream suddenly changes its course, the boundary does not change with the new course, but remains as it existed before the sudden change. *Purvine,* 238 Or. at 62–63, 393 P.2d at 183. Courts have reasoned that when a boundary stream suddenly forms a new course "the boundary formed by the original stream is identifiable by reference to the bed left dry as a consequence of the sudden shift in the stream." *Id.* at 64, 393 P.2d at 183. Thus, there is no need to alter the original boundary. The nature of the change that has occurred, rather than the time in which it occurred, appears to be the determinative factor. *See, e.g., Purvine, supra.*

■ The principles relating to accretion and avulsion are pertinent because the 1887 Kindred-United States deed designates certain boundaries by reference to the low water mark. That mark was substantially altered when the tidelands north of plaintiffs' property were filled in the early 1940's. The parties disagree about the effect of the fill on their respective boundaries. Plaintiffs contend that the rule for accretion applies, while defendant contends that the rule for avulsion applies.

In determining the boundaries of property fronting along the same bank of a river, the courts are guided by another general principle: absent agreement between the parties, the property should be divided so as to give each riparian owner a proportionate share of river frontage. With that purpose in mind, a court may choose among a variety of apportionment methods depending on the facts of the case. *Tauscher v. Andruss,* 240 Or. 304, 307 n. 1,

401 P.2d 40, 42 n. 1 (1965), citing *Columbia Land Co. v. Van Dusen,* 50 Or. 59, 91 P. 469 (1907).

■ Where the course of the river is fairly straight and the side lines of the riparian tract are perpendicular to the course of the river, the side lines are simply extended to the median line of the stream. *Belmont v. Umpqua Sand & Gravel,* 273 Or. 581, 588–89, 542 P.2d 884, 889 (1975). Where the side lines of the tract meet the stream at an acute angle, however, this method may deprive one of the riparian owners of access to deep water. Consequently, to fairly apportion such river frontage, the dividing lines may be drawn at right angles to the thread of the stream or pierhead line, intersecting the boundary lines of the upland tract at the high water mark.

■ This method was introduced in Oregon in *Montgomery v. Shaver,* 40 Or. 244, 66 P. 923 (1901). In *Montgomery,* the upland boundary line between plaintiff's and defendant's property met the Willamette River at an acute angle. Defendant, owner of the property to the south, extended its wharf to a point in front of plaintiff's land. Plaintiff asserted that the wharfage rights to the area occupied by the proposed extension belonged to him. On appeal, the court enjoined defendant from use of the disputed territory, holding that each party was entitled to wharfage rights out to the channel within side lines drawn at right angles to the thread of the stream, intersecting the upland boundary lines at the high water mark. *Id.* at 247, 66 P. at 924.

This equitable doctrine was used to apportion Columbia River frontage in *Columbia Land Co. v. Van Dusen,* 50 Or. 59, 91 P. 469 (1907), and more recently, to apportion the bed of a nonnavigable river, in *Belmont v. Umpqua Sand & Gravel,* 273 Or. 581, 542 P.2d 884 (1975).

In this case, the 1887 conveyance to the United States included upland property and tideland area north to the low water mark. The high and low water marks, however, were substantially altered by the filling of

the tidelands by the United States in approximately 1944. In construing the conveyance, two questions arise: first, should the *Montgomery* rule apply; and second, if so, which high water mark is determinative.

Defendant contends that, notwithstanding the terms of the 1887 deed, *Montgomery v. Shaver* changed the boundaries of the United States's tidelands from north of the upland property to a direction at right angles to the high water mark, and that the high water mark was fixed at the point at which it was located in 1944, prior to the filling of the tidelands. Defendant asserts that applying the *Montgomery* rule alters the boundaries of its property to include the the disputed property.

Defendant further argues that even if the rule introduced in *Montgomery* did not of itself change the boundaries of the United States's tidelands to a direction at right angles to the high water mark, this change was accomplished by agreement between the United States and Hammond Lumber in 1907 when the walkway was relocated.

The *Montgomery* rule is an equitable doctrine, intended to be applied only out of necessity. The effect of defendant's theory would be to deprive plaintiffs of a portion of their upland property above the current high water mark, as well as below it. It would also require overriding the specific calls in the original deed. These consequences are warranted only if there is no other method to fairly apportion the water frontage in this situation. *See Belmont v. Umpqua Sand & Gravel,* 273 Or. 581, 542 P.2d 884 (1975).

Arguably, there is no reason to invoke the *Montgomery* rule because the original deed may be construed to carry out the parties' intent and achieve an equitable division. The deed conveys to the United States the tideland property north to the low mark. Assuming that the filling of the tidelands was an accretion, when the shoreline of the river was altered in 1944 the upland boundaries shifted as well. The current boundaries would be a direct extension of the original upland dividing lines.

Under this approach, defendant would own the tideland area north up to the current low water mark, just as described in the original deed. This is a substantial and proportionate parcel of tideland and guarantees defendant access to the river.

Even if the *Montgomery* rule were applied, defendant would not obtain title to the disputed parcel unless I were to adopt its theory that the determinative high water mark was fixed as of 1944. The premise of this theory, presumably, is that any changes in the high water mark prior to 1944 were the result of accretions, while the filling of the tidelands in 1944 resulted in an avulsive change. If the change were avulsive in nature, the riparian boundaries would not shift with the change in the river and its high water mark, but would remain fixed at that point at which it was prior to the fill.

In characterizing changes in riparian properties as accretions or avulsions, Oregon courts have evaluated the particular facts of a case in light of underlying policy considerations. In *Purvine v. Hathaway*, 238 Or. 60, 63–64, 393 P.2d 181, 183 (1964), the Oregon Supreme Court emphasized the importance of readily ascertainable boundaries. Hogue Creek connected two channels of the Willamette River and formed a boundary between plaintiffs' and defendant's land. High water increased the volume of Hogue Creek until the main volume of the Willamette's east channel flowed through Hogue Creek. The court noted that this was not a case in which the boundary stream shifted suddenly and formed a new course. There was no dry bed left by which the boundary formed by the original stream could be identified. The boundary continued to be in the bed of the flooded stream. Despite the fact that the change in the river was sudden, the court rejected plaintiffs' contention that the rule for avulsion was applicable. The court reasoned:

> Treating the boundary as immutably fixed along the thread of Hogue Creek prior to the sudden increase in its volume would in no way resolve uncertainties in

the location of the boundary line as the stream changed its course in the future. If, however, the thread of Hogue Creek continues to be recognized as the movable boundary, the respective interests of the owners on either side of the stream can be readily identified as the stream gradually changes its course. Thus the policy of readily ascertainable boundaries and discouraging boundary disputes and litigation is served.

238 Or. at 65, 393 P.2d at 184.

In *Corvallis Sand & Gravel*, 283 Or. 147, 582 P.2d 1352 (1978), the sudden flooding of the Willamette River converted an overflow channel into the main channel of the river. The court distinguished cases involving rapid erosion of or accretion to the river bank along the established bed, observing that this case involved an actual change in the course of the river. 283 Or. at 167, 582 P.2d at 1364. Consequently, the court ruled the change in the location of the river was avulsive and did not result in a change of ownership of the river bed.

A few Oregon cases have considered the avulsion-accretion distinction when the changes in water flow were of artificial, rather than natural origin. Most of such cases, however, involve disputes over the ownership of the particular portion of upland property subject to the changes. For instance, in *Gillihan v. Cieloha*, 74 Or. 462, 145 P. 1061 (1915), a channel was filled when the federal government built a dam at its upstream end and dredged material from another channel was thrown over the dike as waste. The filling was due in part to accretions caused by the change in water flow and in part to the sudden dumping of material into the water. The court held that the addition to the land was an accretion that accrued to the upland owner; thus, the boundary followed the water flow. 74 Or. at 467, 145 P. at 1061.

The upland owner in *State Land Board v. Sause*, 217 Or. 52, 342 P.2d 803 (1959), disputed the state's claim to tideland area created by his dredging to construct a log dump. The court, in dictum, concluded that a riparian owner does not change his

boundary when he makes a use of his land which results in a sudden recession of his bank, nor can he add to his land by suddenly filling out from the bank. 217 Or. at 102, 342 P.2d at 827–28.

The dispute in this action is not over ownership of the additional land created by the filling of the tideland area north of the defendant's property. The dispute arises because the fill moved the high and low water marks and thereby indirectly affected the parties' upland boundaries. If the *Montgomery* rule is applied and the boundary lines are drawn at right angles from the thread of the stream to the point defendant contends is the 1944 high water mark, defendant would own the disputed land. If the determinative high water mark is the *current* high water mark, plaintiffs would own the disputed parcel.

Defendant would have a proportionate share of tideland with river access if its boundaries were simply extended to include all the accreted land within its east-west boundary lines, or if the *Montgomery* rule were applied using the current high water mark as the point of intersection with the upland boundary. Given this, it is inappropriate to resolve this dispute by reference to the 1944 high water mark, a point that has no present significance other than that attributed to it by defendant in support of its claim in this action. I need not decide which of the competing theories of apportionment apply, because in declining to adopt defendant's theory that its boundary is drawn at right angles from the 1944 high water mark, I find that defendant has no claim to ownership to the disputed tract based on the original conveyance.

■ I also decline to accept defendant's argument that the 1907 agreement between the Life Saving Service and Hammond Lumber gave the defendant fee title to the disputed parcel. I find that the agreement to relocate the Life Saving Service's walkway in a direction at right angles to the pierhead line simply relocated the easement across the property, and did not operate as a conveyance of the parcel itself.

B. *Nature And Scope Of The Easement.*

The 1887 Kindred-United States deed recites that the described lot of land is being acquired by the Secretary of the Treasury on behalf of the United States "as a site for a Life Saving Station." The deed states that the conveyance of the property is

with full right of egress and ingress thereto in any direction over other lands of the grantor by those in the employ of the United States, on foot or with vehicles of any kind, with boats or any articles used for the purpose of carrying out the intentions of Congress in providing for the establishment of Life Saving Stations, and the right to pass over any lands of the grantor in any manner in the prosecution of said purpose....

Plaintiff contends that the legal interest created by the 1887 deed in plaintiffs' predecessors' property, described as a "right of egress and ingress," is an easement. This easement, according to plaintiffs, is a limited one, created only for life saving services. Plaintiffs assert that the 1906 and 1944 relocations of the walkway simply relocated the easement with no change in use. When the Coast Guard decommissioned the Point Adams Station in 1967, plaintiffs argue, the easement ceased to be used for life saving purposes. Upon approval of the Board of Survey's recommendation that the boathouse and the walkway be declared "excess to the needs of the Coast Guard," the defendant abandoned the easement, under plaintiffs' theory. Thus, plaintiffs argue defendant no longer has any interest in the disputed parcel.

I have already rejected defendant's claim of fee simple ownership by deed and operation of Oregon law. In the alternative, however, defendant asserts that it has acquired a prescriptive easement for the walkway and ownership to the land west of the walkway by adverse possession. It concedes that the Coast Guard ceased to use the station for direct life saving purposes in 1967, but asserts that in subse-

quent years it was used by the Coast Guard for telecommunications activity, and that other government agencies have continued to use regularly the walkway since 1967. Defendant's evidence indicates that the Corps of Engineers used the walkway to measure tides on a regular basis from the 1920's or 1930's through 1974. The evidence also showed that since 1969 the NMFS has regularly used the walkway to access its research boats and tide gauges.

■ An easement exists where the land of one person is subjected to some use or burden for the benefit of the lands of another person. *Patterson v. Chambers' Power Co.*, 81 Or. 328, 348, 159 P. 568, 575 (1916). The 1887 Kindred-United States deed conveys "full right of egress and ingress ... in any direction over other lands of the grantor." The 1907 letter from defendant to Hammond Lumber refers to this interest as a "right of way." The term "right of way" generally signifies an easement in the absence of special circumstances indicating a contrary meaning. *Capelli v. Justice*, 262 Or. 120, 128–29, 496 P.2d 209, 213 (1972). I conclude that the interest conveyed to defendant by the 1887 deed was an easement.

■ An easement may be extinguished by abandonment. Abandonment means conduct manifesting the intent not to make future use as authorized by the easement. *Bernards v. Link & Haynes*, 199 Or. 579, 587, 248 P.2d 341, 344, 263 P.2d 794 (1953). The evidence indicates that defendant does not intend to resume use of the easement for life saving services. The evidence also indicates, however, that other government agencies have used the easement in much the same way as did the Coast Guard.

■ The issue is whether the language of the deed so strongly indicates an intent to limit the easement to the use described in the deed that any other use is unauthorized. If so, the easement was terminated when the Coast Guard no longer used the walkway for life saving purposes.

The deed's description of the easement's purpose should be viewed in the context of the purpose of the conveyance itself. The deed provides:

> Whereas, the Secretary of the Treasury has been authorized by law to establish the Life Saving Station herein described. And whereas, Congress by Act of March 3d, 1975 provided as follows: viz: "And the Secretary of the Treasury is hereby authorized whenever he shall deem it advisable, to acquire by donation or purchase in behalf of the United States, the right to use and occupy sites for Life Saving of Life Boat Stations, Houses of Refuge and sites for Pier Beacons, and the establishment of which has been, or shall hereafter be authorized by Congress." And whereas, the said Secretary of the Treasury deems it advisable to acquire, on behalf of the United States, the right to use and occupy the hereinafter described lot of land as a site for a Life Saving Station, as indicated by his signature hereto. . . .

This language does not create a fee simple defeasible. *See, e.g., Stansbery v. First Methodist Episcopal Church*, 79 Or. 155, 154 P. 887 (1916) (conveyance of realty "for the purpose of a parsonage, church, etc.," without indicating how long that use shall continue, held not to create defeasible fee); *Gange v. Hayes*, 193 Or. 51, 237 P.2d 196 (1951) (deed will not be construed to create an estate on condition or limitation unless the intent to do so is clearly indicated). The court in *Selectmen of Town of Nahant v. United States*, 293 F.Supp. 1076 (D.Mass.1968), construed a deed similar to the one at issue as giving the United States an estate in fee simple absolute. The court observed that "[t]he mere recital in the deed of the purpose for which the land conveyed was to be used is not in itself sufficient to impose any limitation or restriction on the estate granted." *Id.* at 1078. *But see, e.g., United States v. Beals*, 250 F.Supp. 440 (D.R.I.1966); *Etheridge v. United States*, 218 F.Supp. 809 (E.D.N.C.1963).

In this case, the deed's reference to life saving purposes is simply a method of describing the nature of the use to be made of the property. Likewise, the description

of the easement merely indicates that the easement is to be used in a manner consistent with the purpose of the conveyance itself. Although no attempt was made to define the nature of the easement's use, the obvious purpose was to provide access to the river. The deed contains no further limitations on the character or duration of the use, and states that the passage over the grantors' land may be "on foot or with vehicles of any kind, with boats or any articles ...." The deed contains no language suggesting a reversion or automatic expiration of the easement if used for purposes other than those associated with life saving services.

From the time of the conveyance until the time the station was decommissioned in 1967, all use of the walkway by the Life Saving Service and the Coast Guard may presumably be characterized as for "life saving services." Testimony at trial indicated that, generally, the Coast Guard's use of the area was limited to using the walkway to gain access to the boathouse. Between 1968 and approximately 1977, Coast Guard activity at the station was limited to telecommunications. Other government agencies have used the walkway in the same manner in which the Coast Guard used the walkway, to gain access to the boathouse. In sum, after the Coast Guard decommissioned the Point Adams Station in 1967, there was no significant change in the character of the use of the easement.

Disputes have frequently arisen over the extent to which the originally contemplated uses of an easement may be modified to accommodate changing circumstances. The Oregon Supreme Court surveyed the leading cases on the issue in *Bernards v. Link and Haynes*, 199 Or. 579, 248 P.2d 341, 263 P.2d 794 (1953). The grant at issue in *Bernards* conveyed a right of way for a railroad, which both parties contemplated would be used for logging. Plaintiff asserted that the easement was extinguished when defendant converted the railroad to a logging road. The court observed:

From the earliest of times the courts, in their construction of instruments which granted easements, have sought to discern and give effect in a practical manner to the purposes of the grant, with the result that the grantee in his enjoyment of the easement has never been restricted to the exact condition which existed when the grant was made.

199 Or. at 593, 248 P.2d at 347. The court held that the change did not extinguish the easement, reasoning that "right of way of a railroad" was a current way of expressing the intention of the parties to grant a way upon which the grantee would bring logs to town. 199 Or. at 603, 248 P.2d at 352.

In *Jones v. Edwards*, 219 Or. 429, 347 P.2d 846 (1959), the court focused on the extent to which the specific language in a written instrument limits the scope of an easement. The easement in *Jones* was described as "[a] gateway road right of way over and across" certain property "as said road is now established and traveled." At the time the easement was created, four gates crossed the right of way. Plaintiffs, the servient owners, later constructed two additional gates. Defendants alleged that the two additional gates constituted an unreasonable interference with the use of their easement. The trial court, reasoning that the scope of the easement was controlled by the language "as said road is now established and traveled," held that no gates other than the original ones could be constructed without violating the terms of the grant. The Oregon Supreme Court disagreed, however:

Unless the language of the creating instrument or the attendant circumstances at the time of the grant indicated a contrary intent the scope of an easement is not limited to the uses contemplated to be made at the time or immediately after its creation, either with respect to the permissible uses of the easement or with respect to the permissible uses which may be made of the servient land by the servient owner. In the absence of a contrary intent both the uses of the dominant and servient owners are subject to

adjustment consistent with the normal development of their respective lands. *See Bernards ex ux. v. Link and Haynes*, 199 Or. 579, 248 P.2d 341, 263 P.2d 794 (1953).

. . . .

Admittedly, the language "as said road is now established and traveled" could be interpreted to mean that neither the dominant nor servient owners were intended to have the privilege of expanding the respective uses of their lands. On the other hand, it is possible that the phrase was used simply to designate the relocation and width of the easement and to describe generally the character of the uses which the conveyees were entitled to make of it. The evidence in this case of the intention of the parties is scant. Under these circumstances we think that the instrument should be interpreted in the second sense indicated above, giving it the meaning of an ordinary easement, the scope of which is intended to change with changing needs.

219 Or. at 433–34, 347 P.2d at 848–49.

Courts have generally construed easements created by instrument to be less limited in use than prescriptive easements. An easement created by instrument, having by its nature a prospective operation, may be assumed to have been intended to accommodate future needs. A prescriptive easement, on the other hand, may arise simply because the owner of the servient land failed to make effective objection to the use by which the easement was created. *See Firebaugh v. Boring*, 288 Or. 607, 612, 607 P.2d 155, 158 (1980), citing section 8.69 of II American Law of Property (1952). In *Firebaugh*, the court held that in determining whether a particular use of a prescriptive easement is permissible, comparison should be made between (A) the use by which the easement was created; and (B) the proposed use considering these factors: (1) the relative burdens on the servient tenement, (2) the nature and character of the uses of the easement, and (3) the purposes achieved through the uses of the easement. 288 Or. at 618, 607 P.2d at 160. Although the court was addressing the scope of prescriptive easements, given that such easements are even more limited in use than easements created by instrument, these considerations are of some utility in determining the scope of the easement in this case.

Applying the *Firebaugh* analysis, it becomes apparent that defendant intends to use the easement for the same general purpose as it was used in the past: to provide access to and from the water. The nature and character of the use is also virtually the same: foot traffic on the walkway from the station to the boathouse area. Finally, the relative burdens on the servient estate are identical.

In light of these considerations, is it material whether the ultimate purpose of the defendant's use of the walkway is related to tide measurement and study of estuarine habitat, rather than life saving services? I hold that it is not, given that the 1887 grant in fee simple to defendant did not limit the use of the estate itself to a life saving station, and that the general purpose of the use of the easement has remained the same.

In 1971, the Coast Guard Board of Survey recommended that the disputed property, the walkway, and the boathouse be declared excess to the Coast Guard. This recommendation was approved by Coast Guard Headquarters. Plaintiffs contend that this action manifests an intent by the defendant to abandon its easement.

I reject this contention. The Coast Guard, as an agency of the defendant United States, is required to make excess property available to other federal agencies before giving consideration to disposing of such property to nonfederal bodies. 40 U.S.C. § 483. *See Valley Forge v. Americans United*, 454 U.S. 464, 102 S.Ct. 752, 755, 70 L.Ed.2d 700 (1982). There is no indication in the record that the defendant United States intended to relinquish the easement after the Coast Guard declared it excess to its own needs.

The easement originally conveyed to defendant has not been extinguished. Given this conclusion, I need not address defend-

ant's contention that it has a prescriptive easement.

 Defendant's final contention is that it has acquired the disputed property by adverse possession. To establish title to land by adverse possession, defendant must show that its possession was "actual, open, notorious, hostile, continuous, and exclusive, under a claim of right or color of title, for a period of ten years." *Russell v. Gullett,* 285 Or. 63, 65, 589 P.2d 729 (1979), quoting *Grimstad v. Dordan,* 256 Or. 135, 139, 471 P.2d 778 (1970).

The adverse possession argument must fail. "Permissive use, no matter how long continued, is not adverse, and when proved, denies adverse possession." *Scott v. Elliott,* 253 Or. 168, 178, 451 P.2d 474, 479 (1969). Any use by defendant of this parcel of land has been permissive. The fact that the precise portion of land used for defendant's purposes may have shifted slightly over the years (for instance when the walkway was relocated in 1906 and 1944) does not alter the permissive character of the use.

### III. CONCLUSION.

I reject defendant's contention that it acquired title to the disputed parcel of land in fee simple absolute by operation of Oregon law or by agreement between defendant and plaintiffs' predecessors in interest. I also reject plaintiffs' contention that defendant's easement was extinguished by abandonment when it ceased to be used for life saving services or when it was declared excess property by the Coast Guard Board of Survey. Defendant's interest in plaintiffs' land is limited to an easement for the general purpose of providing access to the Columbia River.

This opinion shall constitute findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

IT IS SO ORDERED.

Appendix to follow.

APPENDIX

Columbia River

Pierhead Line

Columbia River Low Water Mark

Tideland Area Filled in 1944

Boathouse

N

Assumed 1883 Columbia River Low Water Mark

West Boundary of Plaintiff's Tract 2

Disputed Tract

Tract conveyed by 1887 Kindred - U.S. Deed

Walkway

Approximate high water mark prior to 1944 fill

Concrete Sea Wall

Pt. Adams Station