**Elizabeth Koch MEIJER, et al.**

v.

**INTERNATIONAL MINERALS & CHEMICAL CORP., et al.**

**Civ. A. 89–111–B.**

United States District Court, M.D. Louisiana.

July 16, 1990.

---

Paul G. Borron, III, Borron, Delahaye, Edwards & Doré, Plaquemine, La., Raymond B. Gautreau, Donaldsonville, La., for plaintiffs.

Jay J. Szuba, Powers, Vaughn & Clegg, Baton Rouge, La., for defendants.

## RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

POLOZOLA, District Judge.

The parties in this case seek to have the Court interpret the provisions of certain agreements which were entered into by the parties. To better understand the issues involved in this case it is necessary to set forth a summary of the facts which led to the agreements and to this suit.

In late 1980 and early 1981, International Minerals & Chemical Corporation (International) and Ashland Oil, Inc. (Ashland) acquired predial servitudes[1] from numerous landowners through eight separate agreements. These agreements permitted a pipeline to be run from the Agrico Chemical Company (Agrico) plant near Donaldsonville, Louisiana to the Allemania Chemical Company (Allemania) plant near Plaquemine, Louisiana. At the time the servitudes were acquired, International and Ashland owned Allemania as a joint venture. Allemania, which is presently owned solely by Ashland, manufactures methanol. The pipeline is used to transport carbon dioxide, which is used in the manufacturing process, from the Agrico plant to the Allemania plant.

From the completion of the pipeline until July of 1984, approximately 350 tons of carbon dioxide per day were transported through the pipeline. In July of 1984, the plant was shut down because of economic reasons. Although the plant was shut down, the record reveals that in the spring of 1984 and 1985, roughly 200 tons of carbon dioxide were injected into the pipeline from the Agrico end and vented at the Allemania end for the purpose of testing the integrity of the pipeline. It is also undisputed that during the shutdown, except during integrity tests, nitrogen gas was circulated through the pipeline at slightly above atmospheric pressure to prevent corrosion of the pipeline. Representatives or contractors of the Allemania flew over the pipeline approximately once a month to inspect the pipeline. Furthermore, the cathodic protection devices were tested approximately once a year.

On February 18, 1988, Allemania began selling carbon dioxide that it received from Agrico via the pipeline to another plant. Shortly thereafter, the Allemania plant be-

---

1. See Louisiana Civil Code articles 697 et seq.

gan manufacturing methanol again. Since February of 1988, with the exception of several temporary shutdowns caused by Agrico, carbon dioxide has been continually transported through the pipeline for use in Allemania's manufacturing process and for resale to another plant.

The landowners claim that the pipeline was not used for its intended purpose from July of 1984, when Allemania shut down, until February 18, 1988 when Allemania received carbon dioxide from Agrico for resale. They further contend that the language of the agreements supports their position that the servitudes have been terminated. Seven of the eight agreements provide in part as follows:

> If at any time said right of way and easement [servitude] is not used during a period of *two years for the purpose hereinabove specified,* or in the event it should at any time be used for any other purpose than herein granted, then in either of such events all rights vested in GRANTEE hereunder shall, at the option of GRANTORS, and on the giving of written notice to GRANTEE, cease and terminate. [emphasis added]

The eighth agreement, which was executed on behalf of Cora–Texas Manufacturing Company, Inc. (the "Cora–Texas Agreement") states:

> Upon completion of construction of the pipeline if at any time said right of way and easement [servitude] is not used during a continuous *thirty (30) month period for the purpose herein specified,* or in the event that it should at any time be used for any other purposes than herein granted, then in either of such events all rights vested in the GRANTEE hereunder shall at the option of GRANTOR and on the giving of written notice to GRANTEE, cease and terminate. [emphasis added]

Between September 21, 1988 to January 4, 1989, International, Ashland, and Allemania were notified in writing by the plaintiffs that their rights under the servitude agreements were terminated pursuant to the above quoted provisions. The landowners have now filed this declaratory judgment action seeking a determination that the pipeline servitudes have prescribed or terminated for non-use.

As noted earlier, the landowners contend that the pipeline was not "used" during the four and a half years that Allemania was shut down. They argue that Allemania's intent in obtaining the servitudes was to use the pipeline for the transportation of carbon dioxide to be used in the manufacturing process. The landowners contend that the defendants' use of the pipeline which consisted of the constant flow of nitrogen, the two integrity tests using carbon dioxide, the monthly aerial inspections, and the annual testing of the cathodic protection devices were not sufficient to constitute "use" within the meaning of the agreements and Louisiana law. According to the plaintiffs, these activities were intended to test, maintain, and inspect the pipeline which are mere accessory rights to the servitude and do not amount to use of the servitude.[2]

In response to the plaintiffs' contentions, Ashland argues that the continual flow of nitrogen, the integrity tests, the aerial inspections, and the cathodic device tests were sufficient "use" of the pipeline under the servitude agreements and Louisiana law. Ashland contends that under the agreements, which were drafted by the landowners with some input from Ashland and International, "use" was not limited to the transportation of carbon dioxide for manufacturing purposes. Ashland asserts that the servitude agreements unambiguously provide that a legitimate purpose of the pipeline servitudes is the preservation and maintenance of the pipeline for future use. Therefore, Ashland contends these activities are not accessory rights under the agreements. Furthermore, Ashland contends that the constant flow of nitrogen gas through the pipeline during the period of shutdown is sufficient "use" even if the

---

**2.** La.Civ.Code art. 761 states:
   The use of a right that is only accessory to the servitude is not use of the servitude.

agreements are interpreted to allow termination by the landowner if materials are not transported through the pipeline during a two year period under seven of the agreements or during a 30 month period in the Cora–Texas Agreement.

Thus, the Court must determine whether the pipeline servitude was used "for the purpose hereinabove specified" in the agreements during the period Allemania was shut down. The parties have submitted a Joint Statement of Uncontested Issues of Material Fact, in connection with the cross motions for summary judgment each has filed.

The pipeline "right of way and easement" described in the agreements is a predial servitude under Louisiana law.[3] "The use and extent of such servitudes are regulated by the title by which they are created."[4] Therefore, it is necessary for the Court to examine the servitude agreements executed by the parties to determine whether there was "use" of the servitude[5] under the facts of this case.

The agreements contain similar language regarding the purpose of the servitudes. Three of the agreements state that the servitudes are granted:

> ... for the purpose of constructing, maintaining, operating, repairing, replacing and removing, in whole or in part, one pipeline for the transportation of liquids, gases, solids or any combination thereof across the following described land [or lands]....

Another agreement inadvertently omitted "liquids, gases, solids or any combination thereof". However, an amendment to this agreement provides:

> WHEREAS, there was inadvertently omitted from said right of way grant a description of the products to be transported through said pipeline and the par-

ties desire that said products be described;

> \* \* \* \* \* \*

> ... it is agreed that the products to be transported through said pi[pe]line shall consist of liquids, gases, or mixtures of all thereof.

Several of the agreements use slightly different language with respect to the phrase "liquids, gasses, solids, or any combination thereof". Two agreements contain the language "liquids, gasses or mixtures thereof". Another agreement uses the language "liquids, gases, or mixtures of or all thereof". In addition, the Cora–Texas Agreement states that the grantor:

> ... hereby grants, sells, conveys and delivers ... a right of way and servitude to lay, construct, operate, inspect, maintain, repair, renew, substitute, and remove one pipeline, not exceeding eight and 5⁄8 (85⁄8) inches outside diameter, for the transportation of liquids, gases, or mixtures of any or all thereof, across and through the following described land....

The difference in the above language does not affect the final decision in this case.

In analyzing the servitude agreements, it is important to note that under Louisiana law the "words of the contract must be given their generally prevailing meaning."[6] The contract must be considered as a whole and "each provision must be interpreted in light of the other provisions."[7] The servitude agreements do not contain any other provisions relevant to the issue of "use" of the pipeline except that quoted above. None of these agreements contain any provisions specifically requiring that the purpose of the pipeline be for the transportation of carbon dioxide to be used in the manufacturing process of methanol. Moreover, the agreements fail to specify the types of liquids, gases, or solids that may to be transported through the pipeline. Finally, the agreements are silent as to

---

**3.** See La.Civ.Code arts. 697 et seq.

**4.** La.Civ.Code art. 697.

**5.** See *Louisiana Petroleum Co. v. Broussard,* 172 La. 613, 135 So. 1 (1931).

**6.** La.Civ.Code art. 2047.

**7.** La.Civ.Code art. 2050.

Allemania's utilization of any such transported substances.

 The landowners contend that "the pipeline was constructed for the purpose of transporting carbon dioxide to the Allemania Plant for use as a process gas in the manufacture of methanol." [8] In support of this argument, the landowners rely on the deposition testimony of Hugh Lansford, the plant manager of Ashland Chemical Company in Plaquemine, Louisiana. However, the Court shall not consider this testimony to determine the intent of the agreements. The Court finds that "the words of [the agreements] are clear and explicit and lead to no absurd consequences." [9] The clear and express purposes of the agreements imposed on the defendants the obligation of "maintaining" and "operating" the pipeline. This language is certainly broad and general enough to include testing, inspecting, and preserving the pipeline which was performed by Allemania and its contractors during the shutdown. Moreover, nitrogen gas was being transported almost continuously through the pipeline during the shutdown. Contrary to the landowners assertions, the agreements do not expressly or even impliedly limit the use of the pipeline servitude to the transportation of carbon dioxide for utilization by Allemania in its manufacturing process. Neither "carbon dioxide" nor any information concerning Allemania's products or processes are mentioned in the agreements. In addition, nothing in the agreements discusses how, or even if, materials transported through the pipeline are to be utilized by Allemania.

Furthermore, it was proper for International and Ashland to bargain for and obtain pipeline servitudes which allowed other uses of the pipeline than the transportation of carbon dioxide. Indeed, it would have been reasonable for International and Ashland to anticipate temporary plant shutdowns, modifications of manufacturing processes, and other factors that may affect the usage of the pipeline servitude for transportation of carbon dioxide. It would be equally reasonable for the landowners to limit the use of the pipeline to a single purpose—the transportation of carbon dioxide. Such was done. Considering the clear and unambiguous language of the agreements, the Court finds that the defendants properly used the pipelines for their intended purpose during the relevant periods involved in this case. Thus, the Court finds that the servitude agreements have not terminated.

Because of the Court's decision herein, it is not necessary for the Court to consider the issue of laches.

The parties shall submit an appropriate judgment to the Court within ten days.

---

**8.** Brief in Support of Plaintiffs' Motion for Summary Judgment, p. 2.

**9.** La.Civ.Code art. 2046. The Court also notes that since the agreements are not ambiguous, La.Civ.Code art. 730 is not applicable. Article 730 states:

> Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate.

Furthermore, La.Civ.Code article 2056 is also inapplicable. Article 2056 states:

> In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text.