**SHELL OFFSHORE, INC.,**
**Plaintiff–Appellee,**
**Cross–Appellant,**

v.

**KIRBY EXPLORATION CO. OF TEXAS, et al., Defendants–Appellants,**
**Cross–Appellees.**

**No. 89–3462.**

United States Court of Appeals,
Fifth Circuit.

Aug. 23, 1990.

---

George Frazier, Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, New Orleans, La., for defendants-appellants cross-appellees.

Judith Y. Robertson, John T. McMahon, Charles M. Raymond, New Orleans, La., for plaintiff-appellee cross-appellant.

Before WISDOM, POLITZ, and JOHNSON, Circuit Judges.

WISDOM, Circuit Judge:

This case involves the applicability of the Louisiana law of predial servitudes to a fixed drilling platform on the outer Continental Shelf (OCS) in the Gulf of Mexico and the Louisiana law of obligations to the contract between the parties to this action. We agree with the district court that in this case the Louisiana law of predial servi-

tudes is inapplicable—although we reach our result by a different rationale from that used by the district court. We remand the case for the district court to reconsider its construction of the contract between the parties, particularly in the light of article 2054 of the Louisiana Civil Code and any custom or practice prevailing in the offshore oil industry. The district court should feel free to reach the same result on remand as it reached originally in construing the contract.

## I

In 1962 Shell Oil Company (Shell) leased from the United States three contiguous blocks on the outer Continental Shelf in the Gulf of Mexico, West Delta Blocks 122, 133, and 134. Shell placed an oil drilling platform on each block. In 1978 Shell made a Sale and Assignment to Kirby Exploration Company of Texas of Platform "D", which was located in Block 134, and an eight-inch pipeline that ran from Platform "D" to Platform "B" in Block 133.[1] The pipeline rested on and passed over Shell's Platform "C" in Block 122 and is the only means of moving production from Platform "D" to Platform "B".[2] In return, Kirby gave Shell $549,450 in cash, an overriding royalty interest on products produced from Platform "D" and transported

through the pipeline, and the right to use excess capacity in the pipeline. In 1983 Shell Offshore, Inc. (SOI), the successor to Shell, sold all of its interest in Blocks 133 and 134 and its overriding royalty on production from Platform "D" to Taylor Energy Company.

Shell surrendered its lease on Block 122 in 1970 but remained the owner of the platform subject to the requirements by the United States that Shell maintain the platform and remove it at the request of the United States.[3] In short, it could not shed itself of personal obligations imposed by its lease and government regulations. After SOI divested itself of its interests in Blocks 133 and 134, it asked Kirby to remove the pipeline from Platform "C" in Block 122. Kirby refused. SOI wrote to Kirby contending that under Louisiana property law, when Shell sold Platform "D" and the pipeline to Kirby in 1978, a predial servitude was created on Platform "C" in Block 122; "C" was the servient estate, "D" the dominant estate. As the owner of the servient estate, SOI declared that it was abandoning the servient estate to Kirby, the owner of the dominant estate, and that Kirby was bound to accept it.

In federal district court SOI then sought a declaration that Kirby owned Platform "C", or, in the alternative, that Kirby was

---

**1.** The sale conveyed to Kirby all of SOI's right, title, and interest in:

That certain eight-leg welded steel construction, self-contained drilling and production platform, containing 18 well slots, located on West Delta Block 134 in the West Delta Block 133 Field and designated as OCS–G 1107 West Delta Block 134 Platform "D", with all improvements and appurtenances including the D–4 and D–5 wells heretofore drilled by Shell Oil Company and the platform crane. The center of said Platform "D" is located at distances of 3592.3 feet south and 4647.2 feet west of the northeast corner of said Block 134, said center having Louisiana Lambert coordinates of: X = 2,512,282.7 and Y = 28,-199.6. Included in the property conveyed herein is that certain eight-inch (8″) nominal diameter pipeline commencing at said Platform "D" and going thence to West Delta Block 122 Platform "C" and thence to West Delta Block 133 Platform "B" through the existing piping and pig receiver, thence through the Kirby, et al., facilities located on the recently constructed wing deck on West

Delta Block 133 Platform "B" and ending at the point said pipeline is connected to the Shell-owned facilities on West Delta Block 133 Platform "B".

**2.** See appendix.

**3.** Shell's lease with the United States provided:

Sec. 6. *"Removal of property on termination of lease.*—Upon the expiration of this lease, or the earlier termination thereof as herein provided, the lessee shall within a period of 1 year thereafter remove from the premises all structures, machinery, equipment, tools, and materials other than improvements needed for producing wells or for drilling or producing on other leases and other property permitted by the lessor to be maintained on the area." Lease No. OCS–G 1104.

Under 30 C.F.R. 255.76, Shell was authorized to leave the platform in place until such time as the United States requests its removal. Until that time, Shell would be responsible for maintaining the platform.

responsible for maintaining and ultimately removing the platform.[4] Each party moved for summary judgment. The district court held, first: "Because SOI had no independent rights with respect to Block 122, it is inconceivable that SOI could have granted a predial servitude affecting that block to Kirby. SOI cannot grant greater rights in property to Kirby than SOI had." Thus, abandonment was not an option available to SOI. Second, the district court ruled that nothing in the Sale and Assignment of Platform "D" and the pipeline gave Kirby the right to support its pipeline on "C". The court, therefore, ordered Kirby to move its pipeline. Both parties appeal.

## II

The Outer Continental Shelf Lands Act declares that the law of the adjacent state applies to the outer Continental Shelf, except insofar as it conflicts with that Act itself, or other federal laws or regulations.[5] In this case, the law of Louisiana applies to the issues in this dispute, except to the extent that it is inconsistent with federal law.

■ SOI's position is grounded on the contention that a predial servitude exists in favor of Platform "D" against Platform "C". "A predial servitude is a charge on a servient estate for the benefit of a dominant estate."[6] The servitude must burden, and benefit, corporeal immovables belonging to separate owners.[7] Consistent with the notion that a predial servitude is a charge on an estate, not a person, article 651 of the Louisiana Civil Code provides that "[t]he owner of the servient estate is not required to do anything. His obligation is to abstain from doing something on his estate or to permit something to be done on it". In this case, Shell argues for the existence of a servitude that is manifested by exterior works: the presence of the pipeline crossing over Platform "C". It thus alleges the existence of an apparent servitude.[8] There are three modes of acquiring an apparent servitude: title, destination of the owner, and acquisitive prescription.[9]

Shell's contention that a predial servitude exists in favor of Kirby on Platform "C" raises three obvious issues. First, whether a servitude was established by title, destination, or prescription. Second, whether a fixed oil drilling platform on the OCS is a distinct corporeal immovable for purposes of property law. And third, whether the Louisiana law of predial servitudes conflicts with federal law.

■ The only possible mode of creation of a predial servitude applicable to the facts of this case is destination of the owner. When there is a relationship between two estates owned by the same owner that would be a predial servitude but for the unity of ownership, an apparent servitude comes into existence of right when one of the estate ceases to belong to the original owner.[10] In this case, Shell was the owner of Platforms "C" and "D". Assuming that the platforms are immovables, the passage of the pipeline over "C" arguably created a situation akin to predial servitude. When Shell sold "D" to Kirby, assuming the existence of the other requisites of the charge, an apparent predial servitude of passage or support would come into existence in favor of Kirby.

Second, Shell argues that the fixed drilling platforms are distinct corporeal immovables. Since the land upon which the platforms are located—the OCS—does not belong to the owners of the platforms, the platforms can be immovables only if they

---

**4.** SOI estimates the future expenses of maintaining the platform at $2.5 million; Kirby estimates the expense of removal at one million dollars.

**5.** Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A).

**6.** La.Civ.Code Ann. art. 646.

**7.** La.Civ.Code Ann. art. 698.

**8.** La.Civ.Code Ann. art. 707.

**9.** La.Civ.Code Ann. art. 740.

**10.** La.Civ.Code Ann. art. 741. The servitude would not come into existence, however, if there is an express provision to the contrary.

are "buildings". "[B]uildings ... are separate immovables when they belong to a person other than the owner of the ground."[11] Constructions other than buildings located on another's land are movables.[12] Permanent drilling platforms have been classified as buildings for purposes of delictual liability suits[13] and cases under the Private Works Act.[14] There is a vague standard for determining what is a building—prevailing notions in society;[15] that standard is the same for purposes of delictual law and property law. Still, it has never been decided that a platform may be a building for purposes of property law, and for the reasons to follow, we need not be the first to answer this question.

█ Louisiana law governs disputes on the OCS only to the extent that it does not conflict with federal regulations.[16] In this case, we find that even if the state law requisites of a predial servitude are present, federal law conflicts with the Louisiana predial servitude scheme.

The purported servitude in this case is the use of the platform to support the pipeline. Federal regulations prohibit SOI, the owner of the servient estate (Platform "C"), from abandoning the platform. Indefinitely, under its lease and under 30 C.F.R. § 256.76, even after SOI surrendered its lease to Block 122 under Platform "C", SOI was still obligated to "condition [maintain] or remove all platforms and other facilities on the land".[17] SOI's inability to abandon Platform "C", under the United States lease and regulations, is incompatible with the civilian concept of predial servitudes. The right of the owner of the servient estate to abandon the servitude is an essential component of the concept of predial servitudes. Article 770 of the Louisiana Civil Code provides:

> A predial servitude is extinguished by the abandonment of the servient estate.... It must be evidenced by a written act. The owner of the dominant estate is bound to accept it and confusion takes place.

Inability of an owner to abandon a servitude fundamentally alters the concept of a predial servitude as a charge on an estate, not on a person.[18] The absence of that escape mechanism converts the charge from one on an estate to one resembling a personal obligation.[19] Accordingly, we af-

---

**11.** La.Civ.Code Ann. art. 464.

**12.** La.Civ.Code Ann. art. 475. *See also* La.Civ. Code Ann. art. 464 comment (d).

**13.** *Olsen v. Shell Oil Co.,* 365 So.2d 1285 (La. 1978) (applying article 2322 of the Louisiana Civil Code). The owner of the servient estate owes an obligation to the owner of the dominant estate by virtue of the servitude, but if the obligation, by law or contract, falls on the owner of the servient estate rather than on the estate, it is a personal obligation, not a predial servitude. Yiannopoulos, 4 *Louisiana Civil Law Treatise, Predial Servitudes,* § 3, p. 8 (1983).

**14.** *P.H.A.C. Services v. Seaways Int'l,* 403 So.2d 1199 (La.1981).

**15.** *See, e.g., Id.* at 1204 and *Ellis v. Dillon,* 345 So.2d 1241 (La.App. 1st Cir.1977).

**16.** The Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a)(2)(A).

**17.** 30 C.F.R. 255.76 provides:
A lease of any officially designated subdivision thereof may be surrendered by the record title holder by filing a written relinquishment, with the appropriate OCS office of the MMS. No filing fee is required. A relinquishment shall take effect on the date it is filed subject to the continued obligation of the lessee and the surety to make all payments due, including any accrued rental, royalties and deferred bonuses and to abandon all wells and condition or remove all platforms and other facilities on the land to be relinquished to the satisfaction of the Director.

**18.** La.Civ.Code Ann. art. 646. Ordinarily, the owner of the servient estate may be relieved of these incidental affirmatives by abandoning the servient estate. Yiannopoulos, 4 *Louisiana Civil Law Treatise: Predial Servitudes* § 5 (1983).

**19.** The French Code Civil mirrors the Louisiana Civil Code in this respect. Article 686 provides that persons may establish servitudes on or in favor of their estates as long as "the burdens are not established against a person or in favor of a person, but only in the estate and for the estate...". Addressing the possibility of duties for the preservation of the servitude, article 699 states that the owner of the servient estate "can always exempt himself from such duty by abandoning the tenement subject thereto to the owner of the tenement to which the servitude is due".

firm the district court's ruling that no servitude exists on Platform "C".[20]

### III

■ It is true that the language of the Sale and Assignment includes no specific provision granting Kirby the right to continue to use Platform "C". It is also true that the contract contained no provision requiring Kirby to remove the pipeline from Platform "C" at the request of SOI. When SOI made the sale to Kirby, the pipeline was resting on Platform "C" and was in use. It is inconceivable that Kirby would have purchased the pipeline if its use could have been cut off at any time by SOI. It may well be that SOI intended at some point to abandon Platform "C"—if it could without violating its lease with the United States or 30 C.F.R. 256.75. But there can be no doubt that Kirby expected to use the pipeline in the future under the same conditions that existed when it bought it.

In the circumstances of this case, when apparently neither party to the Sale and Assignment anticipated that a dispute would arise over the continued maintenance or removal of Platform "C", we conclude that a court charged with resolving the dispute should not be tied hand and foot to the literal language of the contract. The Civil Code does not solve the problem—but it points the way. Louisiana Civil Code article 2054 provides:

> When the parties make no provision for a particular situation, it must be assumed that they intended to bind themselves not only to the express provision of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose.[21]

It is arguable that equity favors Kirby. Kirby purchased a pipeline that was in place and operational. The pipeline rested on Platform "C" before and after the sale, and long after Shell surrendered its lease on Block 122. Shell retained an overriding royalty on products transported through the pipeline. Only after it divested itself of any interest in those products did it demand removal of the pipeline. On the other hand, SOI will be put to great expense in maintaining and removing Platform "C", should the United States require it either to maintain or to remove the platform. There may be other equities in favor of SOI. It is in the interests of justice for the district court to explore the customs and practices in the offshore oil and gas industry in dealing with the type of problem presented in this case.

### IV

We AFFIRM the district court's ruling that there was no predial servitude on Platform "C" in Block 122. We REVERSE the ruling that Kirby remove the pipeline pending the district court's reconsideration of its construction of the Sale and Assignment in the light of Article 2054 of the Louisiana Civil Code, and any hearing the district court might consider it advisable to hold on the custom or practices in the offshore oil and gas industry bearing on the problem this case presents.

---

**20.** We also reject SOI's arguments that abandonment is authorized by other state-law theories.

**21.** *See also National Safe Corp. v. Benedict and Myrick, Inc.*, 371 So.2d 792, 795 (La.1979) (under the predecessor to article 2054, "not all obligations arising out of a contract need be explicitly stated".).

Although at issue here is the nominate contract of sale, the general rules in Title IV of Book III of the Code (of Conventional Obligations) apply in the absence of a special provision in the articles on sale. La.Civ.Code Ann. art. 2438.

817

APPENDIX

SCHEMATIC of PLATFORMS and PIPELINE

BLOCKS 122, 133 & 134, WEST DELTA AREA, SOUTH ADDITION,
OUTER CONTINENTAL SHELF, OFFSHORE LOUISIANA

N

to Louisiana Coast,
Plaquemines Parish

BLOCK 121

BLOCK 122

Leased by S.O.C. 4/1/62
Lease surrendered by S.O.C. 11/70
Leased by L.L.& E. 7/1/86

BLOCK 123

pipeline
to market

PLATFORM "C"
[ S.O.I. ]

8" pipeline     8" pipeline

PLATFORM "D"
[ K.E.Co. ]

PLATFORM 'B'
[ T.E.Co. ]

BLOCK 134
Leased by S.O.C. 6/1/62
'D' Platform and 8" pipeline assigned
by S.O.C. to K.E.C. 12/12/78

BLOCK 133
Leased by S.O.C. 5/1/62
Assigned by S.O.I. to T.E.C. 6/8/83

BLOCK 132

SOURCES :
M.M.S. Leasing Map (3/89)
Joint Stipulation ( R. 208-11 )
Exhibits D,E,F,G & H to Defendants' Motion
for Summary Judgement ( R. 78-128 )
Exhibit A to Defendants' Opposition to
Motion for Summary Judgement ( R. 414-19 )