Jeron J. LAFARGUE, et al., on behalf of themselves and all others similarly situated

v.

The UNITED STATES of America and Louisiana Intrastate Gas Company.

Civil Action No. 97–2393.

United States District Court, E.D. Louisiana.

May 27, 1998.

594

Peter Stephen Title, Andrew A. Braun, Camilo Kossy Salas, III, Sessions & Fishman, New Orleans, LA, Gregg Lindsey Spyridon, Robert Joshua Koch, Jr., Edmund S. LaTour, Spyridon, Koch, Wallace & Palermo, L.L.C., Metairie, LA, for Plaintiffs.

David F. Shuey, U.S. Department of Justice, Washington, DC, Glenn Kenneth Schreiber, U.S. Attorney's Office, New Orleans, Paul T. Michael, U.S. Department of Energy, Economic Regulatory Administration, Washington, DC, James P. Dore, George William Jarman, J. Carter Wilkinson, Troy J. Charpentier, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman,

LLP, Baton Rouge, Julie Parelman Silbert, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, LLP, New Orleans, LA, for Defendants.

## ORDER AND REASONS GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

VANCE, District Judge.

This matter comes before the Court on cross-motions for summary judgment filed by the plaintiffs and defendants United States of America (the "Government") and Louisiana Intrastate Gas Company, L.L.C. ("LIG"). For the reasons set forth below, plaintiffs' motion is DENIED, and defendants' motions are GRANTED.

## I. BACKGROUND

As summarized by the Court in its Order and Reasons denying defendants' motions to dismiss, *see LaFargue v. United States*, 4 F.Supp.2d 580 (E.D.La.1998), this case revolves around the ownership of a pipeline and underlying servitudes located in the Louisiana Parishes of Iberia, St. Mary, St. Martin, St. James, and Assumption. The servitudes were acquired and the pipeline was constructed by the government as part of its Strategic Petroleum Reserve Plan ("SPRP"), a program that was established under the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. § 6201, *et seq.* The SPRP was intended to serve as a reserve to reduce the impact of energy supply interruptions or reductions in imports of crude oil and refined petroleum products. Under the EPCA, and to the extent necessary or appropriate to implement the SPRP, the government is authorized to "acquire by purchase, condemnation or otherwise, land or interests in land for the location of storage and related facilities." 42 U.S.C. § 6239(f)(1)(B). The government may also "construct, purchase, lease or otherwise acquire storage and related facilities," and "use, lease, maintain, sell, or otherwise dispose of storage and related facilities acquired pursuant to this part." *Id.*

§ 6239(f)(1)(C), (D). Further, the government is authorized to "execute any contracts necessary to carry out the provisions" of the SPRP. *Id.* § 6239(f)(1)(G).

In furtherance of the SPRP, the government sought to construct a 36–inch diameter pipeline to extend approximately 67 miles from the St. James Terminal to the Weeks Island Facility. In order to lay the Pipeline, and pursuant to statutory authority, the Government secured rights-of-way from landowners by means of direct purchase, condemnation, or donation. The named plaintiffs in this proposed class action are parties to a certain Donation of Servitude and Easement dated August 10, 1979 (hereinafter "the Donation").[1] The Donation states:

> The above named parties declare that we, by this act, do donate, convey, transfer, set over and deliver, without any warranty, liability, or recourse, but with full substitution and subrogation in and to all rights and action of warranty which said grantors have or may have against all preceding owners and vendors, unto the United States of America, and its assigns, including its officers, agents, servants, and contractors, a perpetual and assignable easement and right-of-way in, on, over and across the land for the location, construction, operation, maintenance, alteration, repair, and patrol of a single pipeline in the establishment, management, and maintenance of the Strategic Petroleum Reserve
>
> . . . .

Donation at 2. The Donation includes a provision on the causes and procedures for the termination of the easements:

> This donation is made and accepted for and in consideration of Grantors' desire to aid their country in the establishment of a Strategic Petroleum Reserve and in further consideration of Grantee's agreement to construct and operate said pipeline in accordance with the following specific requirements:

1. Plaintiffs noted in prior memoranda submitted to the Court that while this specific Donation of Servitude and Easement pertains only to a small portion of the Pipeline, there are several hundred other landowners who made similar donations, as well as other types of conveyances to the government.

1. The rights herein donated to Grantee shall expire, terminate, and cease and this act shall be rendered null, void and unenforceable on December 31, 1981 if by such date Grantee shall have not commenced construction of the Strategic Petroleum Reserve pipeline.

2. The causes for termination of this easement shall include, but not be limited to, the following: (a) abandonment, (b) removal of the pipeline, (c) ten years non-use, or (d) execution of an affidavit by an authorized representative of the United States of America stating that the pipeline has been abandoned. Upon termination for any reason the United States of America shall have the election at its sole discretion of abandoning the pipeline and related improvements in place or removing it at its own expense. Such removal, if so elected, shall be completed within one year after termination. If abandonment in place is elected, Grantee shall have no claim against Grantors for compensation or damages, and the pipeline and related improvements shall become the property of the Grantors without any payment to the Grantee.

Donation at 5.

The construction of the Pipeline was completed in 1979, and it was in continuous service as part of the SPRP from October 1980 to March 1997. During this time, the Pipeline was used to transport crude oil between the St. James Terminal and the Weeks Island Facility. In recent years, due in part to a geotechnical problem related to the underground storage facility at Weeks Island, the Government removed the oil from that location and in March 1997, decommissioned the Pipeline. The Government no longer uses the Pipeline to transport oil between the two locations.

After the decision to decommission the Pipeline was made, the Government solicited bids from interested parties for the sale of the Pipeline and the perpetual easements. After this suit was filed, the Government sold and conveyed to LIG, "as is" and "where is" under a quitclaim deed executed August 22, 1997 all title, right, and interest the Government had in the Pipeline and the perpetual easements for a total sum of $22,000,000. LIG intends to integrate the Pipeline into its existing pipeline system, which is used for the transportation of natural gas.

Prior to the August 22, 1997 sale, LIG— "out of an abundance of caution"—attempted to enter into new conventional right-of-way and servitude agreements with the landowners along the length of the pipeline (hereinafter the "LIG Agreement"). The LIG Agreement states that the new servitude will be subject to the Donation and that the Donation will terminate when LIG begins operations of the existing Pipeline as a natural gas pipeline or when the Government transfers all of its rights in the Donation, whichever comes first. *See* Compl., Exh. B. LIG contends that 95% of the landowners along the length of the Pipeline have entered into such agreements. LIG's Answer ¶ 1A.

Plaintiffs initiated this class action on July 31, 1997 and filed a first amended complaint on October 24, 1997. Plaintiffs' proposed class is defined as all those persons and entities who granted servitudes and easements in favor of the Government for the location, construction, operation, maintenance, alteration, repair, and patrol of the Pipeline. Compl. ¶ 8. The plaintiffs also propose two subclasses: (1) All those persons and entities who fall into the proposed class and who executed the LIG Agreement, or similar documents; (2) All those persons and entities who fall into the proposed class and who *did not* execute the LIG Agreement, or similar documents. Compl. ¶ 9.

In its Order and Reasons denying defendants' motions to dismiss, this Court concluded that plaintiffs' case was exclusively brought under the Quiet Title Act, 28 U.S.C. § 2409a ("QTA"). Consequently, the Court dismissed Counts II, III, IV, and V of plaintiffs' complaint because they sought relief that is not available under the QTA. The Court also declined to exercise supplemental jurisdiction over Count IV of plaintiffs' complaint, a claim requesting this Court to determine whether the Pipeline constitutes a corporeal immovable under Louisiana law and whether certain plaintiffs' agreements with LIG should be rescinded for lesion beyond

moiety. The Court further refused supplemental jurisdiction over LIG's counterclaim for expropriation of plaintiffs' property.

The lawsuit in this Court is therefore whittled down to a single issue: Whether the servitudes granted to the Government by the plaintiffs have been terminated, extinguished, and/or abandoned as a result of the alleged non-use of the Pipeline and the alleged decommissioning of the Weeks Island Facility. Plaintiffs allege that the servitudes have expired and/or terminated for the following reasons:

(a) the Government, through its own actions, has permanently discontinued the use of the Servitudes for the purpose for which they were granted, *i.e.*, in connection with the Strategic Petroleum Reserve, and has transferred, or is in the process of transferring its right under the Servitudes and to the Pipeline to a transferee engaged in the business of transporting natural gas, rendering it impossible for the Government to use the Servitudes for the purposes required thereby;

(b) the Servitudes were granted subject to the express or implied resolutory condition that the Pipeline be used solely in connection with the Strategic Petroleum Reserve Program and the resolutory condition has been fulfilled;

(c) the Government has decommissioned, or is in the process of decommissioning the Weeks Island Facility and the Pipeline; and/or

(d) the Government has renounced the Servitudes.

Compl. ¶ 42.

Before the Court are the parties' cross-motions for summary judgment. The Court rules as follows.

## II. DISCUSSION

### A. Summary of Arguments

Plaintiffs suggest that the Donation must be interpreted under Louisiana law, and they offer three theories based on state law principles governing predial servitudes in support of their position that the servitudes donated to the Government have terminated and/or expired: (1) the dominant estate, Weeks Island, was destroyed; (2) the servitude is no longer used in a manner consistent with the Donation; and (3) the servitudes were granted subject to the resolutory condition that the Pipeline be used solely in connection with the SPRP.

The defendants offer a number of arguments contrary to plaintiffs' three theories. First, the Government reiterates its argument that the government cannot dispose of property without explicit Congressional authority.[2] Second, relying on what is purported to be federal common law, the Government argues that abandonment, or a change in the use of the property, does not invalidate the Government's title. Third, the Government argues that, in any case, it has not abandoned the Pipeline or the servitudes. Fourth, the Government responds directly to plaintiffs' theories and asserts that Weeks Island is not the dominant estate, and there are no resolutory conditions in the Donation. Similarly, LIG contends that the servitudes have not terminated under any theory of state law. For the reasons more fully explained below, the Court holds that the Government has maintained ownership of the servitudes and the Pipeline continuously since 1979, and plaintiffs' lawsuit is without merit.

**2.** The Court once again rejects this argument and notes that the cases relied on by the Government for this assertion involve condemnation proceedings in which the government acquired the disputed property under its power of eminent domain. It is true that in those circumstances— *i.e.*, condemnation proceedings—the Attorney General is authorized to agree, on behalf of the United States, to return the property to the original land owners. *See* 40 U.S.C. § 258f. The cases cited by the Government, *e.g.*, *United States v. 434.00 Acres of Land*, 792 F.2d 1006, 1010 (11th Cir.1986); *United States v. Three Parcels of Land*, 224 F.Supp. 873, 876 (D.Alaska 1963), state that the court is without authority to order the revesting of title in the original owners because § 258f entrusts such matters to the Attorney General. This case is a quiet title action in which the plaintiffs donated easements to the government. This is not a condemnation proceeding, and the Government did not acquire the disputed property under its powers of eminent domain. Statutes governing condemnation proceedings are wholly inapplicable to this lawsuit, and cases involving such proceedings are therefore distinguishable.

## B. Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Factual controversies are resolved in favor of the non-moving party only if there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc). The court must determine whether there are any genuine issues of material fact which preclude judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## C. Governing Law and Nature of the Servitudes

The first question raised by the parties is whether state or federal law governs the interpretation of property rights in an action brought under the QTA. Courts are divided on this issue: Many courts apply state law without comment. *See, e.g., Patterson v. Buffalo Nat'l River,* 76 F.3d 221 (8th Cir. 1996); *Bradford v. United States,* 651 F.2d 700 (10th Cir.1981); *Lethin v. United States,* 583 F.Supp. 863 (D.Or.1984). Some courts conclude that federal law controls in actions under the QTA but that courts may consult state property law and adopt it as the federal standard if that law is neither hostile nor contrary to federal interests. *See, e.g., Mafrige v. United States,* 893 F.Supp. 691, 697–700 (S.D.Tex.1995)("[T]he construction of a deed to which the United States is a party is a question of federal law ...."); *cf. CTHH Enters. v. Brunson (In re Havard),* 209 B.R. 196, 198 (W.D.La.1997) (stating that " 'federal law governs questions involving the rights of the United States arising under nationwide federal programs' " and finding that federal positive law provided sufficient guidance to resolve disputed issue (*quoting United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 726, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979))). Still other courts acknowledge that the QTA should be interpreted according to

federal law, but federal courts may look to state law to determine the application of statutory language to specific facts. *See, e.g., Amoco Prod. Co. v. United States,* 619 F.2d 1383, 1387 (10th Cir.1980) (failing to question whether state law would interfere with federal interests and noting that "questions involving ownership, transfer and title to real estate have traditionally been resolved according to the laws of the state where the realty is located"); *Adams v. United States,* 687 F.Supp. 1479, 1492 (D.Nev.1988) (same). In some instances, the court fails to specify whether state or federal law is applicable. *See, e.g., Stevenson v. United States,* 960 F.2d 147 (Table), 1992 WL 79532 (4th Cir.1992) (unpublished opinion).

The courts are also split on whether federal or state law controls in condemnation proceedings and in cases brought under the Declaratory Taking Act. *Compare United States v. 93.970 Acres of Land,* 360 U.S. 328, 332–33, 79 S.Ct. 1193, 1195–96, 3 L.Ed.2d 1275 (1959) (condemnation proceeding in which Court held that condemnation involves essential government functions and that "where essential interests of the Federal Government are concerned, federal law rules unless Congress chooses to make state laws applicable"); *Higginson v. United States,* 384 F.2d 504, 506 (6th Cir.1967) (citing *93.970 Acres* and stating that "nature of title taken by federal condemnation is subject to determination by federal law unless Congress states otherwise"); *United States v. 434.00 Acres of Land,* 792 F.2d 1006, 1009–10 & n. 5 (11th Cir.1986) (stating that federal government is not subject to common law property rules), *with Coos County Sheep Co. v. United States,* 331 F.2d 456, 460 (9th Cir.1964) (stating that in condemnation proceeding state property law controls nature and extent of rights of United States acquired under easement); *United States v. Certain Property Located in Borough of Manhattan,* 306 F.2d 439, 444–45 (2d Cir.1962) (looking to state law to determine government's property rights in condemnation proceeding); *Foster v. United States,* 221 Ct.Cl. 412, 607 F.2d 943, 948 (1979) ("[W]hen the United States contracts to acquire or in fact acquires real property within a particular state, the laws of

that state control what rights arise in the United States therefrom.").

■ In the absence of any controlling authority in the Fifth Circuit, and against this background of conflicting rulings, this Court must decide the choice-of-law issue. The specific question in this case is whether the interpretation of a conveyance of real property between a private party and the government should be determined by state or federal law when the property was acquired by the government under the authority of the Energy Policy and Conservation Act and the lawsuit was brought under the Quiet Title Act. The Court notes that neither the QTA nor the EPCA specifies the appropriate rule of decision. In the absence of a statutory directive, the Court must first consider whether the matter justifies reliance on federal law. *See Clearfield Trust Co. v. United States,* 318 U.S. 363, 366–67, 63 S.Ct. 573, 574–75, 87 L.Ed. 838 (1943).

This question seems to have been definitively resolved by the Supreme Court in *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 591–94, 93 S.Ct. 2389, 2396–98, 37 L.Ed.2d 187 (1973), a case initiated by the United States to quiet title to properties owned by the United States subject to mineral reservations in favor of various defendants. The Supreme Court concluded that interstitial federal lawmaking was appropriate in that case because it was dealing with the interpretation of a land acquisition agreement that was "(a) explicitly authorized, though not precisely governed by the Migratory Bird Conservation Act and (b) to which the United States itself [was] a party." *Id.* at 594, 93 S.Ct. at 2397. The Court noted that "dealings which may be 'ordinary' or 'local' as between private citizens raise serious questions of national sovereignty when they arise in the context of a specific constitutional or statutory provision; particularly is this so when transactions undertaken by the Federal Government are involved." *Id.* at 592, 93 S.Ct. at 2397.

In this case, under explicit Congressional authority from the EPCA, and to the extent necessary or appropriate to implement the Strategic Petroleum Reserve Plan, the Government accepted donations of easements from the plaintiffs and acquired the rights to the property in dispute. Although the United States did not initiate this lawsuit, the plaintiffs brought suit under the QTA, and the Government is properly a party to this action. As was the case in *Little Lake,* the issues in this case are substantially related to an established program of government operation, and federal interests are clearly implicated by this lawsuit. Thus, the Court finds that the present situation warrants the application of federal common law. *Cf. Georgia Power Co. v. 138.30 Acres of Land,* 617 F.2d 1112, 1115 (5th Cir.1980) (finding that federal interests were sufficiently implicated to warrant protection of federal law where power of eminent domain was exercised by licensee of government agency).

■ The question remaining is whether the court should borrow state law principles to fashion the federal common law. *See Georgia Power Co.,* 617 F.2d at 1115 (*citing United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979)). In *Georgia Power,* the Fifth Circuit held that:

> Basic considerations of federalism, as embodied in the Rules of Decision Act, prompt us to begin with the premise that state law should supply the federal rule unless there is an expression of legislative intent to the contrary, or, failing that, a showing that state law conflicts significantly with any federal interests or policies present in this case.

*Id.* at 1115–16 (citations omitted). This Court has not discovered any legislative intent under either the EPCA or the QTA that federal common law and not state law should supply the rule of decision. The Court therefore turns to "an examination of the considerations relevant to the nature of the specific governmental interests and to the effects upon them of applying state law." *Id.* at 1118 (internal quotations omitted).

The Supreme Court stated in *Little Lake* that "even assuming in general terms the appropriateness of 'borrowing' state law, specific aberrant or hostile state rules do not provide appropriate standards for federal law." *Little Lake,* 412 U.S. at 595–96, 93

S.Ct. at 2398. *See Georgia Power,* 617 F.2d at 1118 ("If the effect of applying state law is virtually to nullify the federal objectives, then there is a conflict that precludes application of state law."). In *Little Lake,* the Supreme Court reviewed a state law that subjected land acquisitions authorized by Congress to a rule of retroactive imprescriptibility. In exercising its authority to acquire land under the Conservation Act, the government gave the prior landowners a mineral reservation of ten years. The state statute would have barred the reversion of the mineral rights to the United States and in effect extend the prior landowners' rights indefinitely. The Supreme Court explained that this rule was plainly hostile to federal interests because retroactive application of the statute to the United States "deprive[d] it of bargained-for contractual interests." *Little Lake,* 412 U.S. at 597, 93 S.Ct. at 2399. The Supreme Court thus concluded that state law did not govern the reversion of the mineral rights at issue in the litigation. *See also North Dakota v. United States,* 460 U.S. 300, 317–20, 103 S.Ct. 1095, 1105–06, 75 L.Ed.2d 77 (1983) (finding state law hostile to federal interests and not applying it to easements acquired by United States); *cf. United States v. Albrecht,* 496 F.2d 906, 911–12 (8th Cir.1974) (holding that if state law would bar conveyance of property to United States then it should not apply because it would destroy national program of acquiring property to aid in breeding of migratory birds).

After a careful review of the applicable state law and the facts of this case, the Court finds that if Louisiana law as interpreted by the plaintiffs applies, then it conflicts with federal interests as stated in the legislation that created the Strategic Petroleum Reserve Plan. The purpose of the SPRP is to "minimize the impact [in any region in the United States] of any interruption or reduction in imports of refined petroleum and residual fuel oil." 42 U.S.C. § 6234(d). To implement the SPRP, Congress gave the Department of Energy the authority to enter into contracts· and to "acquire by purchase, condemnation, or otherwise, land or interests in land" for the location of pipelines. *Id.* § 6239(f)(B), (G). The statute also authorizes the government to "use, lease, maintain,

sell or otherwise dispose of storage and related facilities ·pursuant to this part." *Id.* § 6239(f)(D).

■ Under plaintiffs' interpretation of Louisiana law, the rights-of-way at issue are predial servitudes. A predial servitude is "[a] charge on a servient estate for the benefit of a dominant estate." La. C.C. art. 646. The servient estate and the dominant estate must belong to different owners, and the charge on the servient estate must provide a benefit to the dominant estate. *Id.* art. 647. Plaintiffs argue that the dominant estate is the Weeks Island Storage Facility, property owned by the Government.

Under Louisiana law, a predial servitude is inseparable from the dominant estate, and it cannot be alienated or encumbered separately from the dominant estate. *Id.* art. 650. Thus, if the Government's rights-of-way are predial servitudes, Louisiana law would prohibit the Government from selling the rights-of-way separately from the Weeks Island Facility. The statute creating the SPRP, however, specifically empowers the Secretary to use, maintain, sell or *otherwise dispose* of storage and *related facilities* acquired pursuant to the legislation. The statute does not restrict the government's ability to dispose of related facilities, such as a pipeline, to a simultaneous sale or disposition of a storage facility. Nor does the Donation itself so limit the transferability of the Pipeline right-of-way. Since state law would prevent the Government from selling the pipeline rights-of-way separate from the Weeks Island Facility, it would produce a result that is clearly inconsistent with both federal interests and the Government's intentions as evidenced by the Donation.

In an analogous situation, the Fifth Circuit rejected the application of Louisiana law after it determined that Louisiana property law would interfere with federal interests. In *Shell Offshore, Inc. v. Kirby Exploration Co.,* 909 F.2d 811 (5th Cir.1990), the application ·of Louisiana law on predial servitudes, which provided for the extinguishment of a predial servitude when the servient estate is abandoned, conflicted with the Outer Continental Shelf Lands Act, which prohibited an

owner from abandoning an offshore platform under the circumstances at issue. In light of the conflict, the court refused to apply Louisiana law. *Id.* at 815.

In any case, plaintiffs are wrong to characterize the servitudes created by the Donation as predial servitudes under Louisiana law. The Court finds that the rights-of-way created by the Donation are properly interpreted as personal servitudes of rights of use. Louisiana law recognizes that parties may create a personal servitude of right of use in favor of a natural person or legal entity for a specified use of an estate less than full enjoyment. La. C.C. art. 641. In contrast to a predial servitude, which benefits a dominant estate, a personal servitude is for the benefit of a designated person or legal entity. However, the right of use may confer only an advantage that may be established by a predial servitude, *id.* art. 640, and such personal servitudes are regulated by the rules governing predial servitudes to the extent that their application is compatible with the rules governing personal servitudes. *Id.* art. 645.[3] The Civil Code also provides that a right of use is transferable unless prohibited by law or contract. *Id.* art. 643.

When the instrument which creates the servitude raises a question as to whether the right granted benefits an estate or a particular person, *i.e.*, whether it is a predial or personal servitude, the rules of contractual interpretation as provided in the Civil Code and the rules applicable specifically to servitudes govern its resolution. A.N. Yiannopoulos, *Louisiana Civil Law Treatise, Predial Servitudes* § 128, at 370 (2d ed.1997); *cf. Guillotte v. Wells*, 485 So.2d 187, 189 (La. App. 2d Cir.1986) (examining circumstances under which servitude was created in order to determine its character when servitude was created by oral agreement). Under Louisiana law, the "[i]nterpretation of a contract is the determination of the common intent of the parties." La. C.C. art. 2045. "This intention 'must be determined from the stipulations of the entire instrument ....'" Yiannopoulos, *supra*, at 370–71 (*quoting*

*Rock Island Arkansas & Louisiana Railroad Co. v. Gournay*, 205 La. 125, 17 So.2d 8, 9 (1943)). Servitudes impose restraints on property and restrict the free use and disposal of the estate. It follows that "[s]ervitudes claimed under title are never sustained by implication; the title creating them must be express as to their nature and extent, as well as to the estate that owes them and the estate to which they are due." *Williams v. Wiggins*, 641 So.2d 1068, 1072 (La.App. 2d Cir.1994). *See* Yiannopoulos, *supra*, at 372 (citing cases with same language); *see also Williams*, 641 So.2d at 1068 ("A predial servitude may be created by title where the grantor sufficiently expresses an intent to create such [a] servitude."). The Civil Code also provides that "[w]hen the right granted be of a nature to confer an advantage on an estate, it is presumed to be a predial servitude." La. C.C. art. 733. However, "[w]hen the right granted is merely for the convenience of a person, it is not considered to be a predial servitude, unless it is acquired by a person as owner of an estate for himself, his heirs, and assigns." *Id.* art. 734.

Here, the Donation evidences a clear intent to benefit the United States, and it does not express an intention to benefit any particular property owned by the government. Rather, the Donation generally states that "[t]his donation is made and accepted for and in consideration of [plaintiffs'] desire to aid their country in the establishment of a Strategic Petroleum Reserve." Donation at 4. The Donation does not even mention Weeks Island, the property which the plaintiffs claim to be the dominant estate, and it does not restrict the Government to developing the SPRP at any particular location or to using any specific storage facility. Further, that the legislation provided for the disposal of the property makes it unlikely that the parties intended to restrict the Government's ability to sell the servitudes separately from Weeks Island, a restriction that would apply if the rights were predial servitudes. Indeed, the Donation specifically provides that

---

**3.** Therefore, any theory of termination premised on the existence of a dominant estate is necessarily incompatible with a personal servitude of right of use because there is no dominant estate.

However, other grounds for termination—*e.g.*, the happening of a resolutory condition—may govern personal servitudes of right of use.

the rights transferred are assignable. Finally, the utility of the predial servitude must be attributed to any person who, at any given time, happens to own the dominant estate. *See* Yiannopoulos, *supra*, § 9, at 33. Thus, "[i]f the utility is attributed to a designated owner, the servitude is personal rather than predial." *Id.* Here, plaintiffs expressly contend that the rights-of-way were intended to benefit only the United States in the establishment of the SPRP, a position inconsistent with an intent to grant rights-of-way on their property that would exist in favor of the owner of Weeks Island, whoever that may be. The United States acquired these easements to enable them to construct and operate a pipeline that would be a part of the SPRP. It is clear that the utility of the servitudes is attributed to the United States, not Weeks Island or any other estate.

For all of these reasons, the Court concludes that under Louisiana law the servitudes created by the Donation are personal servitudes of rights of use. This interpretation of the application of state law neither frustrates federal interests nor constrains the Government's bargained-for interests. Accordingly, the Court borrows Louisiana law to fashion the federal common law.

### D. Plaintiffs' Theories of Termination

 Plaintiffs' first theory of termination—the destruction of the dominant estate—necessarily fails because the easements are personal servitudes and are not dependent upon the existence of the dominant estate. The remainder of plaintiffs' theories are premised on the argument that the servitudes created by the Donation were limited ones, granted only for the construction and operation of a pipeline to assist in the Strategic Petroleum Reserve Plan. The plaintiffs argue that using the servitudes for *any* other purpose, *i.e.*, for a purpose that does not assist the SPRP, amounts to abandonment, an express cause for termination under the Donation. In a similar vein, plaintiffs also argue that the servitude has terminated because the purpose for which it was granted, *i.e.*, only for the SPRP pipeline, has become an impossibility. As a final variation of this same theme, plaintiffs contend that using the

servitude in a manner inconsistent with the limited purpose alleged is a resolutory condition, the happening of which results in the termination of the servitude under Louisiana law. *See* La. C.C. art. 773 ("A predial [or personal use] servitude established for a term or under a resolutory condition is extinguished upon the expiration of the term or the happening of the condition.").

As in *Lethin v. United States*, 583 F.Supp. 863, 871 (D.Or.1984), the issue in this case boils down to whether the language of the Donation so strongly indicates an intent to limit the easement to the single use urged by the plaintiffs that any other use is unauthorized. If so, the servitude was abandoned, impossible to use, and/or terminated when the Government stopped using it for purposes of the SPRP.

The Court concluded above that the servitudes at issue are personal servitudes of rights of use. As such, they are regulated by the application of rules governing predial servitudes, to the extent their application is compatible with the rules governing rights of use servitudes. La. C.C. art. 645. The Civil Code makes clear that "[t]he use and extent of such servitudes are regulated by the title by which they are created." *Id.* art. 697. *See* Yiannopoulos, *supra*, § 149, at 416 ("[T]he extent and manner of use of conventional servitudes established by title are primarily determined in accordance with the intention of the parties, as expressed in the provisions of the title."). Thus, whether the Donation imposes a restriction of a single permissible use of the servitudes depends upon the description of the easement contained in the Donation and the specific language used in the agreement.

Under Louisiana law, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." *Id.* art. 2046. The Civil Code also provides that "[t]he words of a contract must be given their generally prevailing meaning." *Id.* art. 2047.

In Louisiana, explicit language is required in order to impose either a restrictive or dissolving condition. *See, e.g., Farrell v. Hodges Stock Yards, Inc.*, 343 So.2d 1364,

1367–69 (La.1977) (contract stating "'this grant of way shall continue in full force *as long as* the said property shall be used for the business for which it is now used or any other of like nature'" did not provide for automatic dissolution upon change of use); *accord* Ralph E. Boyer et al., *The Law of Property* 85 & n. 12 (4th ed.1991) (explaining fee simple determinable under common law and noting that words such as "until," "during," "while," or "so long as" are often used to create special limitation). Further, non-use or abandonment provisions in contracts are typically enforced when a specific limited purpose is clearly contemplated by the parties. *See, e.g., Meijer v. International Minerals & Chemical Corp.,* 741 F.Supp. 1238 (M.D.La.1990) (enforcing provision that provided that "[i]f at any time said right of way and easement is not used during a period of two years for the purpose hereinabove specified, or in the event it should at any time be used for any other purpose than herein granted ... all rights vested in grantee ... cease and terminate" but finding that use was ongoing and consistent with agreement); *Heirs of Primeaux v. Erath Sugar Co., Ltd.,* 484 So.2d 717 (La.App. 3d Cir.1986) (finding resolutory condition and reversionary interest when contract stated that "in case said Refinery shall cease to operate ... then and in that case said land shall revert to the said appearer"); *Noel Estate v. Kansas City Southern & Gulf Ry. Co.,* 187 La. 717, 175 So. 468 (1937) (finding that contract limited use of land to railroad purposes only when contract stated that land was "conveyed for railroad purposes only and this grant shall be in perpetuity or so long as it is used by said Company, its successor, or assigns, for railroad purposes, but if abandoned by said Company for such use and purpose, then said land shall revert to the grantor").

The Donation between the plaintiffs and the Government states in pertinent part:

The above named parties declare that we, by this act, do donate, convey, transfer, set over and deliver, without any warranty, liability, or recourse, but with full substitution and subrogation in and to all rights and action of warranty which said grantors have or may have against all preceding owners and vendors, unto the UNITED STATES OF AMERICA, and its assigns, including its officers, agents, servants, and contractors, a perpetual and assignable easement and right-of-way in, on, over and across the land *for the location, construction, operation, maintenance, alteration, repair, and patrol of a single pipeline in the establishment, management, and maintenance of the Strategic Petroleum Reserve,* as authorized by ... Congress ....

....

TO HAVE AND TO HOLD *the complete perpetual rights, powers, privileges of the easement and/or servitude hereby conveyed* unto the UNITED STATES OF AMERICA and its assigns, including its officers, agents, servants, and contractors, *forever,* subject to the other provisions hereof.

....

The aforementioned servitude is acquired by the United States of America for an[d][sic] *in connection with the Department of Energy's Strategic Oil Storage Program.*

....

This donation is made and accepted for and in consideration of Grantors' desire to aid their country *in the establishment of a Strategic Petroleum Reserve and in further consideration of Grantee's agreement to construct and operate said pipeline* in accordance with the following specific requirements:

....

2. The causes for termination of this easement shall include, but not be limited to, the following: (a) *abandonment,* .... Upon termination for any reason the United States of America shall have the election at its sole discretion of abandoning the pipeline and related improvements in place or removing it at its own expense. Such removal, if so elected, shall be completed within one year after termination. If abandonment in place is elected, Grantee shall have no claim against Grantors for compensation or damages, and the pipeline and related improvements shall become the property

of the Grantors without any payment to the Grantee.

Donation at 2–5 (emphasis added).

The Court concludes that the language of the Donation does not indicate an intent to restrict the use of the easement solely to the Strategic Petroleum Reserve Plan. It seems clear to the Court that although the easement was granted for the purpose of the "location, construction, operation, maintenance, alteration, repair, and patrol of a single pipeline," any reference to the SPRP merely demonstrates the existence of a public purpose,[4] describes the reasons for the United States' acquisition, and declares the overall purpose for which the plaintiffs expect their donated land to be used. The Donation in this case does not use any words of limitation, and it does not contain any language to suggest that the easement was intended to last only so long as the Pipeline was used in connection with the SPRP. Unlike the cases cited *supra, see Meijer,* 741 F.Supp. at 1240; *Primeaux,* 484 So.2d at 717, the Donation does not indicate that the pipeline easement must be used "only" in connection with the SPRP or that the easement would terminate if it were used "for any other·purpose." Indeed, no limiting words are used when the Donation states its overall purpose.[5] The plaintiffs' interpretation of the Donation is contrary to the clear words of the agreement, and their interpretation of "abandonment" is inconsistent with the term's generally prevailing meaning. "Abandonment" refers to the voluntary relinquishment of possession of a thing by the owner with the intention of terminating ownership, but without vesting it in any other person. *Black's Law Dictionary* 2. (6th ed.1990). *Cf. Guzzetta v. Texas Pipe Line Co.,* 485 So.2d 508, 510 n. 1 (La.1986) (using definition of abandonment from *Black's* in determining whether plaintiffs stated claim for termination of pipeline right-of-way). Moreover, just as the Court concluded in its

prior order that selling or transferring an interest in property is not a disclaimer, such actions also do not demonstrate an intent to abandon the property.

Further, the sale of the Pipeline and the underlying rights-of-way to LIG will not significantly change the character of the use of the easement. The easement was originally acquired by the Government for the construction and maintenance of a single pipeline that would transport crude oil. LIG will use the Pipeline to transport natural gas, essentially for the same purpose as it was used by the Government. The relative burdens on the plaintiffs' estates are therefore identical.

In addition, the plaintiffs' interpretation of the Donation—that the servitudes may be used by the Government only for a purpose that assists the SPRP—is contrary to the plaintiffs' intentions of conveying "a perpetual and assignable easement" to the Government. If plaintiffs' interpretation of the limitations on the easements' use governed, the provision making the servitudes assignable would be rendered meaningless because no person or entity but the Government can operate the SPRP. The existence of such an assignability provision implicitly creates a servitude with a significantly broader permissible use. *Cf. United States v. 434.00 Acres of Land,* 792 F.2d 1006 (11th Cir.1986)·(stating in dicta that provision allowing for reassignment for commercial purposes implicitly created broad scope for permissible use of easement notwithstanding language in conveyance creating " 'an easement and right for the establishment, maintenance, operation and use of a safety area, in connection with the Kings Bay Ammunition Loading Terminal' ").

Courts from other jurisdictions faced with similar factual circumstances have also concluded that language in the agreement setting forth the purpose for the conveyance does not limit the grantee's use of the prop-

---

4. A description of the public purpose is routinely included by the United States in its property agreements when it acquires land through a condemnation action. Under the Declaration of Taking Act, the government is required to state the public use for which the land is taken. *See* 40 U.S.C. § 258a.

5. The Court notes that plaintiffs fail to cite any cases in which a general statement of the purpose for the donation or conveyance was construed as limiting the use to a single use absent explicit language of exclusivity.

erty or create a determinable fee. In *Lethin v. United States,* for example, the court examined a deed in which the original property owners granted to the United States a right-of-way " 'for the purposes of carrying out the intentions of Congress in providing for the establishment of Life Saving Stations.' " *Lethin,* 583 F.Supp. at 870. The court determined that the easement was not limited to use only for life saving stations, and the deed merely indicated that the easement was intended to be used in a manner consistent with the purpose of the conveyance itself, *i.e.,* to provide access to the river. *Id.* at 872. The court also concluded that the deed did not suggest that the easement was to revert or expire if used for something other than life saving services. *See id.* ("The deed contains no language suggesting a reversion or automatic expiration of the easement if used for purposes other than those associated with life saving services."). Other courts reach identical conclusions. *See also Selectmen of Town of Nahant v. United States,* 293 F.Supp. 1076, 1078 (D.Mass.1968) (construing similar deed and holding that "[t]here is no language indicating that the estate is to expire when the property ceases to be used for the purposes mentioned or that it is intended to last only so long as the property is so used.... The mere recital in the deed of the purpose for which the land conveyed was to be used in not itself sufficient to impose any limitation or restriction on the estate granted."); *United States Trust Co. v. State,* 226 N.J.Super. 8, 543 A.2d 457, 460 (1988) (interpreting conveyance for life saving station and finding that "the intent to create a determinable fee is found in the use of the words of limitation, such as 'while,' 'during,' and 'so long as.' .... Words of limitation merely stating the purpose for which the land is conveyed usually do not indicate an intent to create a determinable fee."); *cf. Meijer,* 741 F.Supp. at 1240–41 (interpreting broadly how pipeline could be "used" when agreement specified that rights would terminate " '[i]f at any time said right of way and easement is not used during a period of two years for the purpose hereinabove specified, or in the event it should at any time be used for any other purpose than herein granted' ").

This Court's interpretation of the Donation between plaintiffs and the Government is also consistent with the results reached by courts in the condemnation setting, and under federal law, where it is well established that a declaration of taking generally provides for a fee simple and that "[a] subsequent abandonment of the original purpose for which land was acquired does not affect the validity of the condemnation." *Higginson v. United States,* 384 F.2d 504, 507 (6th Cir.1967); *see United States v. Three Parcels of Land,* 224 F.Supp. 873, 877 (D.Alaska 1963) (stating that if land is acquired in fee simple unconditional, "land may be devoted to a different use without any impairment of the estate acquired or any reversion to the former owners"); *Boorstein v. Massachusetts Port Authority,* 370 Mass. 13, 345 N.E.2d 668, 670 (1976) ("The recitation in the declaration of taking that the easement was 'to be used as a pipeline right of way in connection with the Naval Fuel Depot' did not limit the Federal government's interest in the easement. The proposed use was recited in the declaration of taking not as a limitation but in order to demonstrate the existence of a public purpose for the condemnation ...."); *City of Alameda v. Todd Shipyards Corp.,* 632 F.Supp. 333, 338 (N.D.Cal.1986) (interpreting agreement in which government was party and concluding that phrase describing purpose for conveyance did not express reversionary interest but simply declared purpose for which grantor expected land would be used).

In summary, the Court rejects plaintiffs' definition of "abandonment," finds that the servitudes and the Pipeline are not impossible to use, and concludes that the Donation does not impose a limited use resolutory condition. Thus, using the servitudes in a manner that does not assist the SPRP does not extinguish the easements, and the Court concludes that the rights created in the Donation and conveyed to the Government never reverted to the original landowners. Plaintiffs' claims for relief in this Court are therefore without merit.

Accordingly, and for all of the foregoing reasons, defendants' motions for summary

judgment are GRANTED, and plaintiffs' motion for summary judgment is DENIED.